OPINION OF THE COURT
Edward M. Horey, J.
This action was brought by the plaintiff seeking a deficiency judgment against the defendants on their personal guarantees of a corporate loan following repossession and sale of mortgaged equipment for less than the outstanding indebtedness. By counterclaims, the defendants assert causes of action against the plaintiff for breach of contract and negligent misrepresentation.
The action was tried without a jury. The trial extended over a 13-day period. The issues raised were novel and many multiple briefs (by each party) have been submitted. Extensive research has been done by the court. To what avail will undoubtedly be determined by the appellate courts as each party has indicated an intention to appeal any adverse determination.
There follows this court’s decision.
The facts giving rise to the litigation are interesting; they follow:
The defendants, Erickson and Gordon, were long-term experienced employees of Watson Manufacturing Company of Jamestown, New York. For several years, that company had operated a department for the fabrication of elevator cabs, elevator doors and door fronts. Erickson’s specialty was in the production and installation area of this equipment. Gordon was experienced in sales.
In 1974, as a consequence of recently negotiated labor contracts which proved unfavorable, the Watson Manufacturing Company elected to discontinue production of elevator equipment. Encouraged by the president and others of the Watson Manufacturing Company, the defendants, Erickson and Gordon, contemplated and investigated the formation of a new company which would manufacture their employer’s discontinued line of products.
Contact was made by Erickson and Gordon with the defendant, Steenburn. He was a man known to Erickson and Gordon to be experienced in setting up production lines for manufacturing industrial type equipment and having a specialty back *973 ground in machine shops and steam engineering. He was also a person reputed to have both investment capital and factory space available. Steenburn had earlier expressed an interest in going into business with Erickson. Steenburn joined Erickson and Gordon in investigating the formation of a new business of manufacturing elevator equipment.
After having had prepared some general estimates of cost for "start up” and cash flow statements for initial operation of the proposed business venture, the three defendants contacted The First National Bank of Jamestown relative to arranging necessary financing. Representatives of that bank were favorably disposed to the general plan of the defendants, but insisted on a condition that the Small Business Administration (SBA) be involved in any loan transaction. The defendants were agreeable.
A meeting with a representative of the SBA was arranged and held on March 27, 1974. There, it was disclosed that a condition of participation by the SBA would be personal guarantees of loans by the defendants.
The defendant, Steenburn, objected to the personal loan guarantee requirement. He advised Erickson and Gordon that he wished to discuss plans of financing with his personal financial advisor before proceeding. He sought and received from Erickson and Gordon some general information of the financial status of each.
In the latter part of April, 1974, Steenburn alone met with the person he had described as his "financial advisor”. This was one Gerald Russell, senior vice-president of the plaintiff, Banker’s Trust Company of Western New York. At this meeting, Steenburn advised Russell, generally, of the proposal to form a corporation, the names of his associates, Erickson and Gordon, and the need of the corporation to secure financing in an estimated sum of $200,000 to assure initial production. Cash flow statements indicating such need were delivered to Russell. Upon being advised by Steenburn that the defendants had already contacted The First National Bank relative to financing, Russell told Steenburn: "Ken, I have done business with you for over twenty years. We have had a very good relation. Why don’t you let me have these figures and you can come down — I’ll notify you, and how I possibly might be able to set you up through our bank”. Cash flow statements and financial resumes of Erickson and Gordon were left with Russell. The meeting was concluded.
*974 Steenburn advised Erickson and Gordon that he had contacted Russell concerning initial "start up” and subsequent production financing and that Russell had, in turn, contacted him and requested that he come down and talk to him. He requested Erickson and Gordon to accompany him.
In the first part of May, 1974, all three defendants met with Russell at his office of senior vice-president in the plaintiff bank. At such meeting, Russell suggested two alternate plans under which the defendants could raise capital for initial "start up” of the proposed business.
On a small paper card, Russell wrote out figures for one plan of financing under which $50,000 could be raised. This plan proposed a mortgage by each of the three defendants on their respective homes as follows: by Gordon, $5,500; by Erickson, $22,000; by Steenburn, $22,500.
On a second card, Russell wrote out an alternate plan of financing under which $62,200 could be raised. This plan also proposed a mortgage by each of the three defendants on their respective homes. This plan contemplated that the mortgages would be in the following amounts by the defendants: by Erickson, $28,700; by Steenburn, $28,000 and by Gordon, $5,500.
At this same first meeting between all defendants and Russell, discussion was also had of means by which the corporation to be organized to operate the business could raise operating capital. It was Russell who suggested a plan of financing that would utilize purchase orders. Russell told the defendants that the plaintiff bank would loan up to 50% of the amount of purchase orders obtained by the corporation to be formed by the defendants, providing only that the credit rating of the purchasers was good.
During the course of a private banking transaction at the plaintiff bank, the defendant, Gordon, asked senior vice-president Russell to confirm the fact that he had agreed to loan up to 50% on purchase orders. Russell confirmed the agreement, again adding the proviso that the credit rating of the purchasers must be good.
Following the joint meeting with Russell, the defendants elected to go forward with the proposed business venture. The defendants, Erickson and Gordon, borrowed moneys from the plaintiff bank on a series of promissory notes while arrangements were made to satisfy existing mortgages on their homes and while the mortgage applications to the plaintiff bank *975 could be completed. Erickson and Gordon completed mortgages on their respective homes with the plaintiff bank as mortgagee. Erickson’s mortgage, dated June 12, 1974, was in the amount of $33,000 of which $20,000 was contributed to the corporation; Gordon’s mortgage, dated June 17, 1974, was for $7,300; Steenburn elected not to mortgage his home, but instead to contribute cash which was available to him.
Of the moneys raised on their mortgages, the defendants Erickson and Gordon, purchased stock in North American Cab & Elevator Door Corp., hereinafter referred to as "the corporation”. The purchase of stock by all three defendants was as follows: by Erickson, $7,300; by Steenburn, $7,300 and by Gordon, $7,300.
In addition, the defendant, Erickson, used a part of his mortgage proceeds to effect a loan to the corporation. The defendant, Steenburn, using his own funds, also loaned moneys to the corporation. A summary of the loans made by the defendants to corporation was as follows: by Erickson, $12,700; by Steenburn, $13,950 and by Gordon, $0.
The total money contributions of the three defendants to the corporation by their combined stock purchases and loans were $48,550. This money was used by the corporation to hire employees, purchase equipment and to commence setting up a production line.
The defendant, Steenburn, also contributed lumber and other material to the corporation. It had a proven reasonable value of $750.
The combined total of money and material made by the defendants totaled $49,300.
In connection with the establishment of a production line, the defendants had contemplated the purchase and use of a squaring shear and a press brake, mechanical devices used to cut and form sheets of steel. Aware that the assets of the corporation were inadequate to purchase such equipment, in addition to the other expenses attending the formation of the business, the defendants sought to obtain such equipment by financing its purchase through the plaintiff, Banker’s Trust Company of Western New York.
A second meeting between the defendants and Gerald Russell, senior vice-president of the plaintiff bank, was held on May 28, 1974. The need of a brake and shear, the location and price of suitable secondhand models, as well as the general *976 progress of the corporate business venture of the defendants were discussed. Russell approved a plan of financing for the brake and shear.
Under the approved plan, the plaintiff bank made a loan to the corporation, North American Cab & Elevator Door Corp., on June 28, 1974. The loan was in the sum of $35,000. It was evidenced by a promissory note of the corporation made "on demand” and provided for interest of 12% per annum.
The security for this $35,000 loan was threefold. The corporation executed a security agreement in the nature of a chattel mortgage on the purchased equipment. A contract of repurchase of the equipment by the seller was required. This agreement provided for a repurchase by the seller of the equipment, but at a reduced purchase price. It was effective only in the event of the borrower’s default. Thirdly, each of the defendants, individually, signed an unlimited guarantee of payment of any indebtedness of the corporation to the plaintiff bank.
The squaring shear and press brake were purchased by the corporation and installed in the production line.
A brochure for a line of products to be produced by the corporation was prepared and distributed. Orders for equipment were actively solicited by the corporation. Such solicitation was primarily through the efforts of the defendant, Gordon, who was in charge of corporate sales. The defendants, Erickson and Steenburn, diligently lent their efforts to securing production of the company’s line of products. Actual production was in progress on June 14, 1974.
Aware that the initial "start up” money of $48,550 was rapidly being exhausted, the three defendants sought business financing from the plaintiff bank on the strength of purchase orders which had been obtained by the corporation. These purchase orders were in the approximate sum of $45,000.
In the last week of July, 1974, after telephoning the plaintiff bank, the defendants were advised that senior vice-president Russell was on vacation, but was at his home. Receiving Russell’s permission by telephone, the defendants went directly to his home. They exhibited the purchase orders which had been obtained and advised Russell of the need of the corporation to borrow money.
In their presence, Russell made a telephone call to the plaintiff bank and spoke to a bank oificer named Gustafson. *977 Russell told Gustafson that the defendants would be coming to the bank with purchase orders and he wanted Gustafson to check out the credit rating of the purchasers and to loan 50% of the value of the orders made by purchasers with determined good credit ratings.
The defendants proceeded to the plaintiff bank. They met with a Mr. James Gustafson, who was then a commercial loan officer of the bank. The purchase orders were delivered to him. Upon inquiry, Gustafson estimated that he could check the credit ratings of the purchasers within a day. When completed, Gustafson said he would call the defendants.
The following morning, Gustafson telephoned the defendants. The defendant, Gordon, answered the call. Gustafson advised Gordon that the application for a loan had been turned down. Upon protestation by Gordon that Gustafson was merely "kidding” about the amount of the loan, Gustafson assured him it was not a question of amount, but rather that the bank was not going to lend any money. Gustafson said that was the decision of Mr. Gaden, president of the bank. Advised, upon inquiry, that president Gaden was present at the bank, Gordon said: "We will be right down”.
The three defendants went to the plaintiff bank. They were met by Gustafson who escorted them into the office of president Gaden. Gaden, with unexplained anger, succinctly and tersely advised the defendants that there would be no loan. He described the loan as "the most assinine bit of financing” he had ever seen in his life. When the defendants advised that the bank’s executive vice-president Russell had agreed to it, Gaden’s reply was: "I don’t give a Goddamn who made it; you’re not getting a damn cent out of this bank”. The defendants advised that without a loan the business venture would fail. When no alternate proposal was suggested by Gaden, the defendants departed.
After soliciting other area banks, the defendants secured a loan to the corporation from The First National Bank of Jamestown. This loan was in the amount of $30,000. It was secured by a security agreement in the nature of a chattel mortgage on the equipment of the corporation that was not already encumbered.
With the infusion of the $30,000 loan from The First National Bank of Jamestown, the corporation continued in business for a brief period of time. Two orders of manufactured products were produced and shipped by the corporation before *978 September 9, 1974. On that date, the business of the corporation officially terminated. Through the efforts of the defendant, Gordon, and his use of "moonlight” employees, two additional orders of manufactured equipment were completed and delivered after September 9, 1974.
The total of orders received by the corporation before termination of the business on September 9, 1974, was estimated at $150,000. Additional orders estimated in the amount of $50,-000 were received thereafter.
By arrangement with some purchasers their unfulfilled orders with the corporation were completed by Jamestown Metal Products Company; others were simply canceled.
Each defendant lost the entire investment which he had made, either by stock purchase, or loan, or both to the corporation.
Following default in payment by the corporation on the $35,000 loan made on the squaring shear and press brake, the plaintiff bank repossessed those items of equipment. Following repossession, the brake and the shear were sold separately by the plaintiff bank. The net proceeds of sale were applied to the corporate indebtedness. Both sales were made to Webb Machinery Company. That company had been retained by the plaintiff bank to conduct the sales on a commission basis.
All of the foregoing, this court finds to be facts proven. They constitute the court’s findings of fact.
The plaintiff bank brought the instant action against the three defendants under the personal guarantee against any deficiency. The deficiency alleged is $7,732.15. Plaintiff seeks recovery of the defendants of that sum, together with interest at the rate of 12% per annum from July 28, 1974, together with plaintiff’s attorneys’ fees incurred in connection with the collection of the indebtedness, as well as costs and disbursements of the action.
The defendants, by their joint answer, deny any indebtedness to the plaintiff. Further, they alleged, as an affirmative defense to the plaintiff’s action, the allegation that the plaintiff "neglected” to make all reasonable efforts to sell the machinery and equipment, described in the complaint, at the best prices available, and ignored some interested purchasers.
The defendants also assert two causes of action against the plaintiff by way of conterclaims. The first counterclaim alleges a breach of contract on the part of the plaintiff. The second *979 counterclaim, alternatively, alleges negligence on the part of the plaintiff.
Trial before this court was without jury. Trial of the issues extended over a 13-day period, of which 12 Vi days were occupied by the issues raised on the defendants’ counterclaims and the plaintiff’s reply thereto.
The court first treats the plaintiff’s cause of action for recovery on the written guarantees made by the defendants and their asserted defense to that recovery.
Subdivision (2) of section 9-504 of the Uniform Commercial Code provides simply that: "the debtor is liable for any deficiency”, in the event a secured party has availed itself of the right afforded by subdivision (1) of section 9-504 to effect a sale, lease or other disposition of collateral and a deficiency has resulted.
Subdivision (3) of section 9-504 of the Uniform Commercial Code imposes a condition upon the right of the secured party to obtain a deficiency by containing a requirement that the disposition of collateral which led to the deficiency was affected with "reasonable notification” to the debtor and was "commercially reasonable”, "but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable”. (Uniform Commercial Code, § 9-504, subd [3].)
Under the terms of the statute (i.e., Uniform Commercial Code, § 9-504) it is clear that one means by which a deficiency may be recovered by a second party against a debtor is by an action in which proof is made that the disposition of the collateral was attended by (1) "reasonable notification” to the debtor and (2) that every aspect of the disposition, including the method, manner, time, place and terms were commercially reasonable. (Uniform Commercial Code, § 9-504; Central Budget Corp. v Garrett, 48 AD2d 825; Security Trust Co. of Rochester v Thomas, 59 AD2d 242.)
By dint of a determination recently made in Security Trust Co. of Rochester v Thomas (supra), a second method of recovery of a deficiency is or may be available to a secured party. This is by an action in which the secured creditor proves "the amount of the debt, the fair value of the security and the resulting deficiency”. (Security Trust Co. of Rochester v Thomas, supra, p 247.)
Whether this second means of recovery of a deficiency *980 established in Security Trust Co. of Rochester v Thomas (supra) and binding on this court as one in the Fourth Judicial Department, is a true optional alternative to the first noted and typical action for recovery of a deficiency with its attendant statutory requirements of "reasonable notification” and "commercially reasonable disposition”, or is merely a permitted substitute available only in the instance that the secured party is unable to prove the requirements of the first action, is cast in doubt. The decision, Security Trust Co. of Rochester v Thomas (supra, p 247), after noting the availability of the former action and its requirements states <([f]ailing in such proof, he [secured creditor] may still recover a deficiency judgment by proving the amount of the debt, the fair value of the security and the resulting deficiency” (emphasis supplied). The right of a secured creditor to optionally choose this second means of securing a deficiency judgment by being permitted to ignore a sale or other disposition which was actually had seems questionable. Further, in an instance when the bid of the creditor of typically outstanding indebtedness, or a fortuitous bid by a third party, actually exceeds the "fair value” of the security, the right to ignore the value actually paid and proceed to a deficiency on "fair value” concept would seem questionable.
In any instance, whether it be an optionally permitted alternative, or a conditionally substitute action, and whatever its limitations are, the action established by Security Trust Co. of Rochester v Thomas (supra) has no application to the case at bar. This is for the reason that no proof was offered by the plaintiff of the "fair value” of the security, either at the time of repossession or sale.
Testing the proof which was advanced by the plaintiff against the requirements of subdivision (3) of section 9-504, it is found wanting. First, no proof of notification to the debtor of time and places of sale was made by the plaintiff. The importance of the notice requirement is pointed up by the statute which provides it may not be "waived or varied” (Uniform Commercial Code, § 9-501, subd [3], par [b]).
Secondly, it does not appear, to this court, that the disposition of the repossessed equipment was "commercially reasonable”. Contrary to the argument of plaintiff’s counsel, it is settled that the burden of proof on that score is on the creditor who seeks the deficiency. (Central Budget Corp. v Garrett, 48 AD2d 825, 826, supra; Security Trust Co. of *981 Rochester v Thomas, 59 AD2d 242, 247, supra; Matter of Zsa Zsa Ltd., 352 F Supp 665 and see Ann. 59 ALR3d 369, 378-380 for cases in accord in other jurisdictions.)
A "commercially reasonable” disposition of security has been held to mean a disposition "made in the good faith attempt to dispose of the collateral to the parties’ mutual 'best advantage’ ”. (Central Budget Corp. v Garrett, supra, p 825, cited with approval and "for guidance” by Appellate Division, Fourth Department, in Security Trust Co. of Rochester v Thomas, supra, p 247.)
Here, the plaintiff bank had requested and received as one item of security for its loan of $35,000 an agreement from the seller of the equipment to repurchase the same in event of default. The seller that entered into that agreement was Webb Machinery Co. The plaintiff did not seek to enforce that agreement of repurchase. Instead, it hired Webb Machinery Co. to act as its agent for the purpose of selling the repossessed equipment.
A sale of the repossessed press brake only was first made by the Webb Machinery Co. This was in December, 1974 and for $10,000. $9,000 of the proceeds of this sale was credited by the plaintiff bank to the indebtedness of the corporation. $1,000 of the proceeds was paid by the plaintiff to Webb Machinery Co. as its commissions for effecting the sale. It is significant to note that the sale on which the commissions were paid was to the Webb Machinery Co., which was also the purchaser. In brief, the agent of the creditor sold the press brake to itself and collected a $1,000 commission. Having purchased the press brake for $10,280, and after having used it approximately two months before its repossession by the plaintiff, the debtor corporation sustained a net loss of $1,280.
The repossessed shear was not sold until April, 1975. Again, the Webb Machinery Co. acted as the agent of the plaintiff bank in making the sale which was for $18,000. Again, the purchaser was Webb Machinery Co. This time, and without explanation, no commission was paid. The full proceeds of sale ($18,000) were credited by the plaintiff to the indebtedness.
Further, it appears that at or about the time of the earlier sale of the press brake in December, 1974, a prospective third-party purchaser, at the sale of the press brake, had offered a respresentative of the Webb Machinery Co. $19,000 for the repossessed shear, after accidently discovering that it was also being held for sale. Whether this offer and others were com *982 municated to the plaintiff bank by the Webb Machinery Co., as its agent, is uncertain. The only testimony adduced on this point was from John Lewis, a representative of Webb Machinery Co. He “believed” that offers had been communicated to the plaintiff bank, but he could not recall any details of those offers, even as to the amount offered. What is certain, and was proved, was that approximately four months after an offer of $19,000 was made for the shear, the plaintiff permitted its agent, Webb Machinery Co., to sell the shear to itself for $18,000.
The foregoing circumstances are properly weighed against the fact that the original purchase price of the shear, when purchased by the corporation, was $23,534. It was sold in April, 1975 to the Webb Machinery Co., the creditor’s agent for the sale, for $18,000. The net loss to the corporation, in the two-month period between purchase and repossession was $5,534. The shear was resold by Webb Machinery Co. a year and a half after its purchase for $23,853. The only improvement made to the shear following its purchase by Webb Machinery Co., at the foreclosure sale, was the cost of "bringing it in, skidding it, cleaning it, touching it up where it was necessary”. This was at an estimated cost of $250. The consequence of the purchase and resale was a profit to Webb Machinery Co. of $5,603.
In Central Budget Corp. v Garrett (48 AD2d 825-826, supra), the court stated: “while the mere 'fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner’ (Uniform Commercial Code, § 9-507, subd [2]; emphasis supplied), marked discrepancies between the disposal and sale prices signal a need for closer scrutiny, especially where, as here, the possibilities for self-dealing are substantial (see, e.g., Jefferson Credit Corp. v Marcano, 60 Misc 2d 138).”
This court is of the opinion that the facts in the instant case signal a need for closer scrutiny than those presented in Central Budget Corp. v Garrett (supra). As determined in that case, there is required some affirmative showing that the terms of the disposition were in fact commercially reasonable. In the absence of such a showing, the claim of a creditor for a deficiency judgment, pursuant to subdivision (2) of section 9-504, should be denied. (Central Budget Corp. v Garrett, 48 *983 AD2d 825, 826, supra, citing Leasco Data Processing Equip. Co. v Atlas Shirt Co., 66 Misc 2d 1089; Jefferson Credit Corp. v Marcano, 60 Misc 2d 138; Associates Discount Corp. v Cary, 47 Misc 2d 369. See, also, recent decision, March 14, 1977, Marine Midland Bank-Cent. v Watkins, 89 Misc 2d 949. See, also, Ann. 30 ALR3d 9, § 26 et seq.)
In the case at bar, this court holds that the plaintiff failed to sustain its burden of proof of "reasonable notification” of sale to the debtor corporation. It further failed to sustain its burden of proof that the disposition of the repossessed shear and brake was in compliance with the statutory requirements of section 9-504 of the Uniform Commercial Code, i.e., that "the method, manner, time and terms” of the disposition were "commercially reasonable”.
As guarantors, the defendants may, and have, properly set up the defense which was available to the corporation as the principal obligor. (See 28 CJ, § 180, p 1044 on subject "Guarantee” and cases cited.) In Aeschlimann v Presbyterian Hosp. (165 NY 296, 300-301) it was said: "It seems to be well established, as a general rule, that a surety may defend an action against his principal, may set up any legal or equitable defense which would have availed the former and may establish it by proof, especially when a party to the action”. In Shapiro v Marstone Distr. (38 AD2d 604) the court said: "A surety is not bound by the default of the principal and may contest its liability to the indemnitee”. (See Walcutt v Clevite Corp., 13 NY2d 48.)
The court turns now to the defendants’ counterclaims. They are two. The first alleges a breach of contract by the plaintiff bank, as promisor, to the defendants, as promisees. The second alleges that the collective action of the plaintiff through its executive vice-president and president was negligently tortious.
Two lesser defenses raised by the plaintiff to the defendants’ counterclaim in contract are respectively, Statute of Frauds and indefiniteness of contract. The court treats these defenses in order.
Section 5-701 (subd a, par 1) of the General Obligations Law provides that an agreement that: "[b]y its terms is not to be performed within one year from the making thereof’ is void unless the agreement or some note or memorandum thereof is in writing.
The court does not find the defense offered by the statute to *984 be applicable. This is for the reason that there is no sufficient evidence establishing that the plaintiffs agreement to loan moneys on the purchase orders was not to be performed within a year. In the court’s view, the agreement could have been performed within that time.
The accepted rule is that to bring an agreement within the one-year provision of the statute, there must be an express and specific agreement not to be performed within such period. If there is a possibility of performance within one year, the agreement is not within the statute. (Nat Nal Serv. Stas. v Wolf, 304 NY 332; Locke v Pembroke, 280 NY 430; Blake v Voigt, 134 NY 69; Warren Chem. & Mfg. Co. v Holbrook, 118 NY 586. See, also, 56 NY Jur, Statute of Frauds, pp 41-42 and cases there cited.)
Further, so far as the defendants are concerned, the agreement has been performed. It continues as executory only on the part of the bank. Part performance, such as here present that (1) is clear, certain and definite in object and design as to refer to the agreement and is unequivocally referable to the agreement, and (2) which will precipitate a fraud on the defendants unless the agreement is executed by the bank, removes the action from the defense of the Statute of Frauds. (56 NY Jur, Statute of Frauds, §§ 250-257 and cases there cited; Eden v Miller, 37 F2d 8, 10.)
The last refuge of a defaulting party to a contract is the defense of indefiniteness. "Rejection of a contract for indefiniteness 'is at best a last resort’ (Cohen & Sons v. Lurie Woolen Co., 232 N.Y. 112, 114).” (Wedtke Realty Corp. v Karanas, 286 App Div 339, 340, affd 309 NY 904. To same effect Castelli v Tolibia, 83 NYS2d 554, affd 276 App Div 1066.)
Absolute certainty in a contract is not required. The test of definiteness in a contract is whether or not the intention of the parties may be ascertained "to a reasonable degree of certainty”. Varney v Ditmars (217 NY 223, 228) gave voice to the Latin maxim "id certum est quod certum reddi potest” in holding that a promise is not too indefinite if it can be made certain by reference to outside matters (1 Williston, Contracts, § 47), quoted with approval in Wedtke Realty Co. v Karanas (supra, p 340. See, also, Wells v Alexandre, 130 NY 642).
In the case for decision, the promise of the plaintiff bank was to loan one half of the amount of orders received from customers with good credit ratings. Such loans were to be *985 repaid upon payment of the orders by the customers. The court does not regard the absence of any definite stated interest rate to be fatal to the agreement. The plain inference from the conduct of the parties would indicate that such interest would be that interest prevailing for similar loans at the respective time successive loans were made by the plaintiff bank on the purchase orders.
As to the duration of the agreement, two of the cash flow projections, which were used in discussion of the loan, indicated an anticipated end to the need of borrowing within a year. The contemplation of the parties was that the loans were to provide, initially, only financial needs of the corporation. They were to terminate as soon as the volume of sales obviated their need. The duration and effect was to be for such a period of time and "on the terms and conditions established by the practical construction of the parties in the light of their prior experience”. (Borden v Chesterfield Farms, 27 AD2d 165, 166.)
In upholding a contract to loan money to a corporation, which was to be formed, against an attack that the agreement to loan was too indefinite as to duration and amount, the Court of Appeals in Stern v Premier Shirt Corp. (260 NY 201, 204) said: "It is clear that all parties — and particularly the defendants — were familiar with the financial requirements of the business and knew well what to be sufficient to carry it on. That required amount is susceptible to proof and hence the agreement may not be said to have been indefinite.”
This court reaches the determination that the lender here, was also familiar with the financial requirements of the business. In the opinion of the court, the surrounding circumstances indicate the approximate scope of the promise as adequately in the case at bar, as they did in Stern v Premier Shirt Corp. (supra). For the reason as there expressed, the contract in issue should be enforced.
Finally, the court believes that the cash flow statements, which were exhibited by the defendants to the plaintiff’s senior vice-president Russell, together with the conversations concerning the anticipated needs of the corporation for initial production financing permit the conclusion that the maximum of loans that would be required approximated $200,000. In the opinion of the court, there existed sufficient frames of reference that could, with reasonable certainty, fix the bank’s obligations. For these and the other reasons noted, the court *986 believes that Arcan Transp. v Marine Midland Bank-Western (54 AD2d 1103) cited by the plaintiff, is properly distinguished.
The principal defense of the plaintiff to the defendants’ counterclaim based on breach of contract is the contention that the defendants, if damaged at all, were damaged as stockholders of the corporation and not individually. It is plaintiff’s assertion that a cause of action, if it exists at all, exists for the corporation which the defendants caused to be formed and not for the defendants. In such defense there is an intertwining of the problems of real party in interest and rights and duties of parties in a third-party beneficiary contract. The court has found the interrelationship of these defenses murky and confusing in the decisional law reviewed in other jurisdictions. In New York State, because of certain peculiarities which arose in the developing progress of actions brought under third-party beneficiary contracts, the confusion has been confounded.
The leading case establishing that a stockholder’s right to maintain an action against a third party may be unaffected by a corporation’s right of action for the same wrong is Eden v Miller (37 F2d 8, supra). It is a landmark case determined in the United States Second Circuit Court of Appeals in 1930 by an outstanding court.
In Eden v Miller (supra), the complaint alleged that the plaintiffs (individuals) entered into an oral agreement with the defendant on terms which provided that a corporation to forward freight was to be organized, financed and operated. The plaintiffs agreed to and did organize the corporation with $40,000 in cash as working capital and entered into its employ. They asserted their best efforts to its management and operation. The defendant agreed to provide the corporation with $60,000 in cash as working capital and to use his best efforts to secure business for it. The plaintiffs by their complaint alleged a breach of contract and damages to them as individuals. The defendant moved to dismiss on the grounds that the plaintiffs, as individuals, stated no cause of action and that such cause of action, if it existed, belonged to the corporation. The motion to dismiss was granted by the District Court. In reversing, the Circuit Court of Appeals said (pp 9-10):
"We will assume for the purposes of this case, without deciding, that the corporation has such right of action, for the recovery of what damages, if any, it has sustained. We are *987 concerned now only with the right of the plaintiffs, as promisees, to maintain an action against the defendant, as promisor, to recover their, not the corporation’s, damages, where the promise is for the benefit both of the plaintiffs and of a third party, who may or may not sue * * *
"Because they performed their promises by organizing the corporation, taking employment, and making an investment in it, in reliance upon the now broken promise of the defendant to give to the business both financial and personal aid, they claim to have been damaged. For such damage as they can prove, they may recover, regardless of any cause of action the corporation may have against the defendant.” (Emphasis supplied.)
This court finds the decision of Eden v Miller (supra) factually analogous to the case for decision, and sufficient authority in itself to deny the motion of the plaintiff to dismiss the counterclaim of the defendants based on a breach of contract. However, additional authority is at hand. The principle enunciated in Eden v Miller (supra) was followed and applied by the Seventh Circuit Court of Appeals in Buschmann v Professional Men’s Assn. (405 F2d 659); by the Fifth Circuit Court of Appeals in Empire Life Ins. Co. of Amer. v Valdak Corp. (468 F2d 330); and by the Sixth Circuit Court of Appeals in Dann v Studebaker-Packard Corp. (288 F2d 201).
Further, it appears clearly that the court in Eden v Miller (supra) classified the corporation which was to be formed by the promisees as a third-party creditor beneñciary as distinct from a donee or incidental third-party beneficiary. "Their [promisees’] right is analogous to that of a debtor, with whom a third person has contracted to pay the debt of the creditor.” (37 F2d at p 10; emphasis supplied.) By parity of reasoning, this court believes that in the case at bar the classification of the corporation as third-party creditor beneñciary is the correct one.
Section 133 of the Restatement of Contracts defines a third-party creditor beneficiary as follows: "(1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is, except as stated in Subsection (3) * * * (b) A creditor beneñciary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary” (emphasis supplied).
*988 The circumstances which attended the instant action disclose nothing which indicate that the defendants intended that the loan from the bank to the beneficiary corporation would be a gift. Clearly they envisioned that such loan would satisfy their duties as stockholders, whether actual or supposed or asserted, to fund the corporation with sufficient wherewithal to manufacture the goods and complete the contracts which the corporation was undertaking.
Viewing, as this court does, the plaintiff bank through the action of its executive vice-president Russell, as the promisor, and the three defendants, as promisees, the corporation to whom the loan was promised, in the opinion of the court was a creditor beneficiary as distinct from a donee or incidental beneficiary. (Restatement, Contracts, § 133 [1] [b] quoted above; and § 136 [2], providing: "Whether the extent of the promisor’s duty to the creditor beneficiary is measured by the promisee’s actual, supposed, or asserted duty to the beneficiary at the time of the making of the contract, or at some other time, depends upon the interpretation of the promise.”)
The importance of properly classifying the parties, and especially in classifying the third-party beneficiary, lies first in establishing the duties of the promisor to the parties.
Section 136 of the Restatement of Contracts provides in relevant part: "(1) * * * (a) a promise to discharge the promisee’s duty creates a duty of the promisor to the creditor beneñciary to perform the promise”. (Emphasis supplied.) It also provides: "(1) * * * (b) a promise to discharge the promisee’s duty creates also a duty to the promisee”. (Emphasis supplied.)
The proper classification of the third-party beneficiary is also important in determining the rights of the parties. As comment a to section 133 of the Restatement of Contracts observes: "A single contract may consist of a number of promises. One or more of them may require performance to the promisee; others may require performance to persons not parties to the contract.”
The third reason for classifying the third-party beneficiary is that such classification deals directly with the damages which may be recovered by a promisee and by a third-party creditor beneficiary. (See Restatement, Contracts, § 345 dealing with damages for breach of a contract for the benefit of a third person.) This is a facet of the instant action which will be later developed. The point now made is that the decision *989 which is reached by this court, viz.: that the defendants have an independent right of action against the the bank has support in the Restatement of Contracts in addition to Eden v Miller (37 F2d 8, supra) and the other cases decided by the United States Circuit Courts of Appeal previously noted.
While decisional law in New York is scant and confusing in part on the proposition that a promisee may sue a promisor under a third-party creditor beneficiary contract, authoritative cases for that proposition are at hand. Earlier cases confirmed the right in all instances. Thus in Claflin v Ostrom (54 NY 581) it was held that since a promisee, a retiring partner, was authorized to sue the continuing partner, as promisor, of a promise to pay the debts of the partnership, the promisee’s assignee was also entitled to sue the promisor.
In Sage v Truslow (88 NY 240), a purchaser of real property, taken subject to a mortgage, had promised the seller to pay certain taxes and assessments that had been levied against the property. The purchaser did not pay the taxes and assessments. A foreclosure of mortgage proceeding was brought and in it, after the payment of the taxes and assessments, a deficiency judgment was entered against the seller. The court held that the seller, as a promisee of the purchaser’s promise to pay the debts of creditor beneficiaries, had an action against the purchaser promisor.
It is conceded that some confusion in New York resulted from decisions which dealt with the situation wherein a grantee of real property, as promisor, promised to pay the mortgage of the grantor-mortgagor and then defaulted. Contrary to, and conflicting with the decision in Sage v Truslow (supra) those cases held that the mortgagor-grantor, as promisee, could not sue the grantee as a promisor until the mortgagor had paid the mortgage to the creditor mortgagee. Upon such payment, the grantor-mortgagor, as promisee, was held "subrogated” to the right of the creditor beneficiary and could then sue the grantee-promisor. (See Miller v Winchell, 70 NY 437; Ayers v Dixon, 78 NY 318; 2 Williston, Contracts [3d ed], § 390.)
Any inconsistency in New York to the general proposition that a promisee may sue a promisor in a third-party creditor beneficiary contract appears to have been limited to the noted mortgagee type cases (2 Williston, Contracts [3d ed], § 390).
This court does not regard the conflicting decisions dealing with the particular and noted mortgage situation to abrogate *990 or impair the right of an individual stockholder, as a promisee, to sue the promisor under a contract wherein the corporation is a third-party creditor beneficiary.
If the individual stockholder has sustained an injury directly affecting him, he has an action against the promisor even though the corporation may also have an action growing out of the same wrong. (Ann. 167 ALR 279, 281, citing the following New York cases: General Rubber Co. v Benedict, 215 NY 18; Parascandola v National Sur. Co., 249 NY 335; Von Au v Magenheimer, 126 App Div 257, affd without opn 196 NY 510; Meyerson v Franklin Knitting Mills, 185 App Div 458; Kono v Roeth, 237 App Div 252, rearg and lv to app den 238 App Div 775; Keating v Hammerstein, 125 Misc 334; Blakeslee v Sottile, 118 Misc 513. See Coronado Dev. Corp. v Millikin, 175 Misc 1, complaint dsmd 262 App Div 504 [for lack of a sufficient allegation as to damages]. See, also, Wither-bee v Bowles, 201 NY 427; and Greaves v Gouge, 52 How Prac 58, affd 69 NY 154. See, also, Eden v Miller, 37 F2d 8, supra; Buschmann v Professional Men’s Assn., 405 F2d 659, supra; Empire Life Ins. Co. of Amer. v Valdak Corp., 468 F2d 330, supra; Dann v Studebaker-Packard Corp., 288 F2d 201, supra.) This court holds here that such right of action may be asserted by the stockholder in contract, in particular, as a promisee under a contract made for a third-party creditor beneficiary.
This court does not agree with the plaintiff that Fifty States Mgt. Corp. v Niagara Permanent Sav. & Loan Assn. (58 AD2d 177) is contrary to the conclusion. In fact, that case confirms the rule: "Where the injury to the stockholder results from a violation of a duty owing to the stockholder from the wrongdoer, having its origin in circumstances independent of and extrinsic to the corporate entity, the stockholder has a personal right of action against the wrongdoer (Shapolsky v Shapolsky, 53 Misc 2d 830, affd 28 AD2d 513).” (58 AD2d at p 179.)
The court finds that the defendants did sustain injury directly affecting them as a consequence of wrong done them by the plaintiff bank.
In the opinion of this court, the conduct of the plaintiff bank to the three defendants was one of economic entrapment.
Aware that the corporation, when formed by the defendants, would need financing to continue production, it was the *991 plaintiff, through its executive vice-president Russell, that conceived of an arrangement for financing on purchase orders secured by the corporation and promised the defendants that financing would be made on that basis. As hereinafter detailed, senior vice-president Russell had the actual and apparent authority to make such loan commitment on behalf of the bank. The bank knowingly permitted the defendants, Erickson and Gordon, to become indebted to it on mortgage loans to secure their share of the known necessary "start up” money of the corporation. It permitted the corporation, when formed, to borrow $35,000 to purchase equipment for installation in a business which was doomed from the start without the promised financing. The plaintiff bank insisted upon, and secured, personal guarantees of the defendants for this investment. Knowingly, it permitted the corporation to solicit orders, establish a production line, commence the manufacture of products, and exhaust its cash reserve in the process thereof, without once issuing a word of warning or caution that the known necessary financing would not be forthcoming.
It was only after the defendants had formed the corporation, funded it with their initial investments by stock purchases and loans, entered into its employ and performed fully on their part, that the plaintiff breached its agreement by reneging on the promised loan. These defendants were led down a primrose path of promised financing and were impaled on the thorns of improvident investments and personal guarantees en route.
It was this same litany of wrongs that, in the opinion of this court, forms the basis for the defendants’ second cause of action sounding in negligence.
This court understands that where one makes a statement with knowledge that the statement is required for a serious purpose, and that it is made for the benefit of another person, who is expected to rely upon it and may be damaged if it is false, the person making such statement is under a duty to the person expected to rely upon it, to exercise reasonable care that the statement made is correct. Failure to exercise reasonable care under such circumstances is the tort of negligent misrepresentation. (See NY Pattern Jury Instructions-Civil, vol 1 [2d ed], p 542, par 2:230; International Prods. Co. v Erie R. R. Co., 244 NY 331, cert den 275 US 527; Glanzer v Shepard, 233 NY 236; Kirshenbaum v General Outdoor Adv. Co., 258 NY 489; Ultramares Corp. v Touche, 255 NY 170; *992 Doyle v Chatham & Phenix Nat. Bank, 253 NY 369; Courteen Seed Co. v Hong Kong & Shanghai Banking Corp., 245 NY 377; Nichols v Clark, MacMullen & Riley, 261 NY 118; Restatement, Torts 2d, §§ 311, 552, 552A, 552B.)
Here, in making the promise that the plaintiff bank would loan money on the corporation’s purchase orders, the plaintiff’s senior vice-president Russell knew that the defendants would rely upon that statement, both in making their investments in the corporation and in guaranteeing the $35,000 loan made by the plaintiff to the corporation. One thing is clear — the statement was not correct; the bank refused to loan 50% on the corporate purchase orders. As to the sole condition to the promised loan, viz.: that the purchasers have good credit ratings, the plaintiff bank has not even asserted absence of this condition as a defense.
The determination of the court is that the plaintiff bank, through its authorized officers failed to exercise reasonable care, under the circumstances, to the defendants.
On the issue of the authority of vice-president Russell to commit the bank to loans, the evidence first shows that he was the bank’s vice-president and senior loan officer. He had authority to make loans. There is some equivocation on the extent of his actual authority. Bank officer Gustafson testified on that issue. He stated that his (Gustafson’s) lending authority was $5,000 unsecured and $10,000 secured. When asked if the lending authority of Russell was more than that, Gustafson replied: "considerably”. Russell’s testimony on the point of actual authority was equivocal. He first stated that his loan authority was subject to veto by bank president Gaden. He then testified that any commitment he made on behalf of the bank within his lending authority would be upheld by president Gaden. He at no time stated the limitations on or conditions of his lending authority.
Whatever doubt attends Russell’s actual authority to commit the bank, the court finds no doubt as to his implied and apparent authority. Russell actively solicited Steenburn to permit his (Russell’s) bank the opportunity of solving the defendants’ problems of financing. The plan to loan on purchase orders was his. The defendants had objected to a plan of financing through the Small Business Administration. They had no other plan. It was for this reason that they sought Russell’s advice and assistance. At no time did Russell advise the defendants of any limitation on his authority to promise *993 loans on purchase orders. A cash flow statement indicating the need of the corporation to borrow for production was contained in the bank’s file referable to the $35,000 loan made on the shear and brake. When the purchase orders were later produced and presented to Russell with the request that he fulfill the promise, Russell did not deny the promise. He did not process the loan application on the purchase order because he was on vacation. Instead, he directed that the purchase orders be turned over to his co-officer, Gustafson, for examination and review, only on the credit rating of the purchaser. Bank president Gaden, in refusing the loan, did not assert that Russell had exceeded his authority, he merely asserted that Russell’s plan of financing on the purchase orders was "assinine”. The words and conduct of the parties surrounding the transaction compel the determination that Russell had implied and apparent authority of the plaintiff to make the proposed plan of financing.
The court finds the defendants free from contributory negligence.
The court finds nothing inconsistent in determining here that the defendants’ right of recovery is supported both by the plaintiffs tortious negligent misrepresentation, as well as the plaintiffs breach of contract to supply financing to a corporate third-party beneficiary. In imposing liability on a public weigher of beans who erroneously gave an improper tally knowing that the plaintiffs would rely thereon, the Court of Appeals, per Cardozo, J., said in Glanzer v Shepard (233 NY 236, 241-242): "We state the defendants’ obligation, therefore, in terms not of contract merely, but of duty. Other forms of statements are possible. They involve, at most, a change of emphasis. We may see here, if we please, a phase of an extension of the rule in Lawrence v. Fox. (20 N. Y. 268) as amplified recently in Seaver v. Ransom (224 N. Y. 233). If we fix our gaze upon that aspect, we shall stress the element of contract, and treat the defendants’ promise as embracing the rendition of a service, which though ordered and paid for by one, was either wholly or in part for the benefit of another. (DeCicco v. Schweizer, 221 N. Y. 431; Rector, etc., St. Mark’s Church v. Teed, 120 N. Y. 583) * * * These other methods of approach arrive at the same goal, though the paths may seem at times to be artiñeial or circuitous. We have preferred to reach the goal more simply.” (Emphasis supplied.)
This court is of the opinion that the common goal to be *994 reached under each theory of recovery is the redress of wrong done the defendants. Proceeding on that basis, it should follow logically that the damage to obtain such redress for the common wrong should be the same in each instance. The court believes that this is the law.
In setting forth the appropriate damages in a case of negligent misrepresentation, the Court of Appeals held them to be properly measured by the consideration paid, plus interest, less the value of what was acquired. (Doyle v Chatham & Phenix Nat. Bank, 253 NY 369, supra.) In Johnson v State of New York (44 AD2d 151), it was held that the proper measure of damages in such action was the out-of-pocket expenses incurred.
The most definitive statement concerning damages for breach of a contract made for the benefit of a third-party creditor beneficiary is stated in subdivision (2) of section 345 of the Restatement of Contracts. There, it is provided that a promisee, as well as a creditor beneficiary, can each get judgment for the value of the promised performance, with interest, "plus compensation for other unavoidable injury to the plaintiff that the defendant had reason to foresee when the contract was made, less the amount that can reasonably be saved by the plaintiff by reason of the breach.”
The fact determining the plaintiff’s misrepresentation to loan, and the breach of its agreement to loan occurred on or about the first day of August, 1974, when the plaintiff’s president Gaden refused to advance any moneys to the corporation on the purchase orders that had been secured.
In reliance upon the plaintiff’s promise to loan operating capital to the corporation, the defendant, Erickson, purchased $7,300 of stock of the corporation, and in addition, loaned that corporation $12,700. The total represented by this stock purchase and loan, to wit: $20,000 was lost by virtue of the determined wrong done him by the plaintiff. The court determines that the defendant, Erickson, has sustained damages in the amount of $20,000, and is entitled to have judgment therefor, together with interest thereon from August 1, 1974.
In reliance upon the same broken promise, the defendant, Steenburn, purchased $7,300 of stock of the corporation, and in addition, loaned the corporation $13,950. Further this defendant contributed materials and supplies to the use of the corporation having a reasonable value of $750. The value of *995 all contributions made by the defendant, Steenburn, and in the total sum of $22,000 was lost by him as a consequence of the plaintiffs wrongdoing. The determination of the court is that the defendant, Steenburn, have judgment against the plaintiff in the sum of $22,000, together with interest thereon from August 1, 1974.
The further claim of the defendant, Steenburn, for reimbursement for the alleged rental value of the premises occupied by the corporation while in business is rejected. The proof on this issue was that such premises were owned not by the defendant, Steenburn, but rather by a corporation known as Broadhead Mills, Inc.
The defendant, Gordon, is determined to have relied upon the broken promise of the plaintiff to loan operating capital to the corporation. This defendant’s contribution to the corporation as a consequence of such reliance, was the purchase of $7,300 of stock of the corporation. That is the measure of his loss. Accordingly, it is determined that he has sustained damage in the sum of $7,300. He shall have judgment for that sum, together with interest from August 1, 1974.
The hard pressed, much badgered and time consuming contention of each defendant, and of their attorney, for recovery of lost profits is rejected. Always speculative to a degree, they pass beyond the pale of any reasonably permitted basis for allowance under the facts presented. They are too uncertain. The business which would have earned the profits was new. Its total existence was less than three months. Its production was limited to two small orders.
With over 10 employees hired, and with $49,300 invested, this court cannot find, as it must for the allowance of lost profits, that such loss was dependent upon the personal skill of the defendants, as distinct from the result of capital investment, or the labor of others. (Steitz v Gifford, 280 NY 15; Kronold v City of New York, 186 NY 40.)
Further, in the opinion of the court, lost profits, if allowed, would properly belong to the corporation and be a measure of damages sustained by it. That corporation is not a party to this action.
Let judgment be entered in favor of the defendants and against the plaintiff in accordance with the determinations reached in this decision.