615 F.2d 68
 Fed. Sec. L. Rep. P 97,262
Samuel MALLIS and Franklyn Kupferman, Plaintiffs-Appellants,
v.
BANKERS TRUST CO., Defendant-Appellee and Third Party
Plaintiff-Appellee,
v.
Jerome B. KATES, Third Party Defendant,
and
Jack J. Arnold, Third Party Defendant-Appellee.
 No. 241, Docket 79-7416.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 25, 1979.
Decided Jan. 25, 1980.
 
 Peter M. Collins, New York City (White & Case, Richard G. Greco, New York City, of counsel), for defendant-appellee and third party plaintiff-appellee.
 Noel W. Hauser, New York City, for plaintiffs-appellants.
 Before FRIENDLY, OAKES and NEWMAN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 Appellants Samuel Mallis and Franklyn Kupferman brought this action in the District Court for the Southern District of New York to recover losses allegedly suffered as the result of a somewhat unusual securities transaction. In addition to appellee Bankers Trust Company, the original defendants included the Federal Deposit Insurance Corporation and the European American Bank as successor-in-interest to Franklin National Bank. The district court, Milton Pollack, Judge, dismissed appellants' claims against all defendants, Mallis v. F. D. I. C., 407 F.Supp. 7 (S.D.N.Y.1975), holding, inter alia, that appellants failed to state a claim against Bankers Trust under the Securities Act of 1933 because they were not purchasers of securities, and, for the same reason, denying appellants leave to amend their complaint to assert a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. On appeal, this court reversed the Securities Exchange Act holding and remanded with instructions to allow appellants leave to amend their complaint against Bankers Trust. Mallis v. F. D. I. C., 568 F.2d 824 (1977), cert. dismissed as improvidently granted, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978) (hereafter Mallis I ).
 
 
 2
 Appellants' amended complaint, filed solely against Bankers Trust, asserted a claim under § 10(b) and Rule 10b-5 as well as pendent state law claims of fraud and negligent misrepresentation. Bankers Trust brought third-party complaints against Jerome B. Kates and Jack J. Arnold, a third-party appellee. The case was tried before Judge Carter and a jury which returned a verdict in favor of Bankers Trust on the Rule 10b-5 and fraud claims; the judge had declined to submit the claim of negligent misrepresentation. Mallis and Kupferman (sometimes collectively referred to as Mallis) appeal from the judgment in favor of Bankers Trust entered on this verdict, alleging, inter alia, error in the district court's treatment of their Rule 10b-5 claim and pendent common law fraud claim, and in its refusal to submit the pendent claim of negligent misrepresentation. Finding errors in the handling of all three claims, we reverse and remand for a new trial.
 
 I. The Facts
 
 3
 The case revolved around 40,384 unregistered "conditional" shares of stock of Equity National Industries, Inc. (Equity National) issued on August 7, 1970 to Jerome and Judith Kates as the result of a merger between Equity-Take Two, Inc., a wholly-owned shell subsidiary of Equity National, and Take Two, Inc., a corporation owned by the Kates. The merger plan and appended Escrow Agreement provided that if the surviving Take Two corporation failed to meet certain earnings requirements, the conditional Equity National shares issued to the Kates were subject to recall for cancellation in whole or in part. In particular, if Take Two failed to show any net earnings for the 1970 calendar year, the Kates' entire block of conditional Equity National stock must be returned. A typewritten legend on the back of the two certificates representing the Kates' shares of Equity National warned that they were
 
 
 4
 subject to the terms of an Escrow Agreement dated August 7, 1970 . . . , and may not be sold, transferred, pledged or hypothecated except in accordance with such Escrow Agreement, a copy of which may be examined at the office of the Corporation.
 
 
 5
 In fact, the surviving Take Two corporation showed a net loss for the 1970 calendar year and filed a petition in bankruptcy on February 18, 1971.
 
 
 6
 Before the facts with respect to Take Two's 1970 performance were known, Bankers Trust accepted the Kates' conditional Equity National shares as collateral on several short-term loans to them aggregating $65,000. The first of these loans was made with a copy of the Escrow Agreement in hand, but was concluded in reliance on a rosy letter from Jerome Kates' attorney. By early 1971 these loans began to sour. Beginning in February or March of 1971, Bankers Trust assigned the Kates' account to a house attorney, Nathan Silverman, for collection purposes. In letters dated March 1, March 4, and April 14, 1971, Bankers Trust received increasingly urgent requests from Equity National demanding the return of the Kates' stock pursuant to the terms of the Escrow Agreement because of Take Two's 1970 loss. On the other side, in a letter dated April 21, 1971, the Kates through their attorneys threatened legal action if Bankers Trust returned the disputed stock to Equity National. In a letter dated May 21, 1971, Silverman formally denied Equity National's request. On June 3, 1971, however, Bankers Trust brought an action against the Kates for repayment of the three overdue notes, and on July 15, 1971, it obtained a confession of judgment for $68,000 and an agreement from the Kates to a "workout" that permitted gradual repayment of their notes over a period exceeding ten years. Bankers Trust continued to hold the certificates for the Kates' Equity National shares.
 
 
 7
 Plaintiffs were not involved in any of the transactions recited up to this point. On February 3, 1972, John Fowler, a broker specializing in the placement of unregistered securities, learned that Jerome Kates possessed a large block of Equity National stock and was also said to hold a block of unregistered shares in Merck & Co., the blue-chip international pharmaceutical manufacturer. Fowler testified by deposition that he was informed that Kates was willing to sell his unregistered shares in both companies, but that the sale of the Equity National shares, by far the less attractive, would have to close first. In early February 1972, Fowler contacted Kates to confirm the availability of the two blocks of stock; he also contacted Jack J. Arnold, the third-party defendant-appellee in this case, who was an associate and an experienced attorney. Arnold expressed interest in the Kates' stock, and, on February 24, 1972, after several conversations with Kates, entered into two contracts: an agreement to purchase the entire block of Equity National shares for $181,000 (of which he paid $25,000 immediately), and a 30-day option to purchase 110,000 unregistered shares of Merck & Co. at 60% of market price. Arnold testified that he and Fowler had planned to split the profits from the resale of the Merck stock. In addition, Arnold testified that he did not learn of the restrictive legend on the back of the Equity National certificates until the closing of the Equity National purchase. Several calls that Fowler and Arnold placed to the National Bank of Georgia, Equity National's transfer agent, apparently failed to reveal any encumbrances on the Equity National stock other than those stemming from its unregistered status under the Securities Act of 1933. Arnold also testified that he saw only a Xerox copy of the front side of the Equity National certificates during the negotiations with Kates that led to the purchase agreement (the certificates themselves being held by Bankers Trust), but was assured by Kates that the reverse side contained nothing unusual. Arnold's continued ignorance of any restrictions on the Equity National stock after he signed the purchase agreement was contested by a portion of Fowler's deposition, introduced by Bankers Trust, in which Fowler claimed to have phoned the president of Equity National on February 25, 1972, to have learned that Equity National would not honor the Kates' stock certificates, and to have informed Arnold of this unsettling conversation on the same day. Appellants objected to the introduction of this portion of Fowler's deposition at trial, and the district court instructed the jury to consider it only "to determine whether or not (Fowler's) telephone call or the telephone calls were in fact made." Arnold, it should be added, denied any knowledge of a telephone conversation between Fowler and the president of Equity National.
 
 
 8
 After the conclusion of the purchase agreement and option contract between Arnold and Kates, Arnold and Fowler began to search for a way to raise the funds to close the Equity National deal. It was this search that brought Mallis and Kupferman into the transaction. Arnold was attorney for Mallis, a dentist, in an unrelated securities matter. On March 1, 1972, during the course of a meeting about this, Arnold revealed to Mallis the broad outlines of the pending deal with Kates. He informed Mallis that he stood to lose his $25,000 deposit on the Equity National purchase agreement unless he could raise $156,000 for the closing of the agreement scheduled two days later; he indicated that he or his clients would soon be in a position to make some $800,000 (without mentioning the Merck shares by name); and he offered a $50,000 fee for short-term financing of his Equity National purchase. Mallis conveyed this information to his brother-in-law, Kupferman, also a dentist, who in turn contacted John Murfitt, then an Assistant Vice President of Franklin National Bank and manager of the Uniondale branch of the Bank. Murfitt testified to having explored the possibility of lending Kupferman and Mallis the requisite funds by contacting Arnold and Silverman on March 2, 1972. Of these alleged conversations, the most critical was between Murfitt and Silverman. Murfitt claimed to have informed Silverman that appellants were interested in borrowing funds to finance the Equity National closing and, as the prospective lender, to have inquired about the availability, negotiability and registration of the Equity National stock. According to Murfitt, Silverman's reassuring response was that the stock was available, that it was "saleable," that the closing of the sale would be a brief and routine affair, but that the deal had to be closed within twenty-four hours. Silverman denied any such conversation. After this brief investigation, Murfitt agreed that Franklin National would advance Mallis and Kupferman the necessary $156,000 providing that they alone would assume total responsibility for its repayment. Murfitt, with appellants' knowledge, falsely characterized the purpose of Franklin National's loan to appellants as financing for a real estate transaction.
 
 
 9
 On the morning of March 3, the day set for the closing, appellants obtained their loan from Franklin National. In addition, Arnold telephonically communicated to Mallis and Mallis approved a letter purporting to confirm the understanding between Arnold and Fowler as to appellants' "participation" in the Equity National transaction.[1]
 
 
 10
 Appellants did not attend the closing but were represented by Arnold, Murfitt, or both Arnold and Murfitt, depending on whose testimony is credited. Murfitt arrived at the closing with three checks representing the funds lent to appellants by Franklin. Besides Murfitt, the other participants in the closing included Arnold, Fowler, Kates and Silverman. The closing was held on the premises of Bankers Trust in a conference room near Silverman's office.
 
 
 11
 The trial testimony as to what transpired during the closing was contradictory on all but a handful of major points. Acting for Bankers Trust, Silverman produced the Equity National certificates from a file that contained some or all of the correspondence addressed by Equity National to Bankers Trust and that may have contained a copy of the Escrow Agreement, see note 2 infra. Upon reading the typewritten legend on the back of the Equity National certificates, Arnold inquired about the Escrow Agreement mentioned in the legend. Kates could not produce a copy of the Agreement. A discussion about the meaning of the legend then ensued. Kates assured Arnold that the requirements of the Escrow Agreement had been met and no restrictions on the stock remained; someone suggested that Kates sign an affidavit to that effect; an affidavit was dictated to Silverman's secretary by either Arnold alone or Arnold and Silverman jointly; Kates signed the affidavit; and Murfitt handed over the checks to Kates, including a check for $45,000 which Kates endorsed to Bankers Trust in partial satisfaction of the Kates' outstanding debt. During the closing Silverman never mentioned the Equity National correspondence that he kept in the same file with the stock certificates.[2] At issue during the trial were the extent of Silverman's knowledge of the terms and significance of the Escrow Agreement; the extent of his participation in dictating the affidavit signed by Kates; and whether, as Arnold and Murfitt alleged, Silverman affirmatively represented the Equity National stock as unencumbered apart from restrictions imposed by lack of registration. The closing ended with Bankers Trust having been repaid $45,000, or the bulk of its then outstanding loan to the Kates, with the Kates receiving the balance of $111,728, and with Mallis and Kupferman holding the 40,384 shares of Equity National as collateral for the payment by Arnold and Fowler of their "investment" of $156,728 and a $50,000 profit. Unknown to the other participants in the transaction, Fowler subsequently received a $10,000 fee from Kates for his services.
 
 
 12
 It soon developed that Kates never possessed the 100,000 unregistered shares of Merck & Co. specified in his option contract with Arnold, the sale of which was to generate the funds to reimburse appellants, and that the Equity National conditional shares were worthless. After the discovery of his fraud, Kates paid Arnold $50,000 which Arnold then paid over to appellants. Arnold and Fowler also contributed an additional $5,135 toward appellants' interest payments on their Franklin National loan. Apart from this, appellants remain out-of-pocket on their payment to Kates, $106,000. In this action they sought recovery of $156,000 on their Rule 10b-5 claim and $206,000 on their state law claims, together with $500,000 in punitive damages, interest and counsel fees.
 
 II. The Rule 10b-5 Claim
 
 13
 Appellants make several claims of error in the court's handling of the Rule 10b-5 claim:
 
 
 14
 The first is that the court erred in charging that in order to recover under Rule 10b-5 the plaintiff must show "that the untrue statement or omission was made in connection with the sale of the shares of Equity National Industries, Inc.". Appellants contend, as they did during the trial, that this issue was conclusively determined in their favor by this court's previous decision, 568 F.2d at 828-30. We do not think our prior decision went so far. It held that plaintiffs should be allowed to amend their complaint to set forth a claim under Rule 10b-5 since as a matter of law a pledge might constitute a sale by the pledgor and a purchase by the pledgee,[3] not that the proofs at a new trial would necessarily demonstrate such a purchase or sale here. The evidence, particularly the March 3 letter, left no room for doubt that Arnold and Fowler had pledged the Equity National shares to Mallis and Kupferman thus creating a seller-purchaser relationship between those two sets of parties. It was not at all clear, however, that such a relationship existed between Bankers Trust and the plaintiffs, as appellants apparently recognized in their argument before the Supreme Court, see note 3 supra. What happened was that Bankers Trust released its pledge of the Equity National stock to the Kates upon receiving payment of its loan, the Kates then sold the stock to Arnold, and the latter pledged it to appellants. Appellants' strongest ground for asserting liability of Bankers Trust under Rule 10b-5 would thus seem to be, as the SEC argued before the Supreme Court, that its deception was "in connection with" appellants being purchasers as a result of having accepted the pledge of the Equity National shares as security for their "investment." Mallis I had not ruled on that precise issue and, while the district court's general instruction that the jury must determine whether appellants had engaged in a purchase or sale of securities left a good deal to be desired, counsel for appellants, who was consistently unhelpful to the district court, suggested no better one.
 
 
 15
 Appellants' second criticism is that the judge improperly allowed the jury to consider a defense of "unclean hands" or in pari delicto even though such a defense was never formally charged to the jury.[4] Appellants' sins are claimed to be twofold. One is that, with their knowledge, Murfitt falsely characterized the purpose of Franklin National's loan to them as financing for a real estate transaction in violation of 18 U.S.C. § 1005. The other is that appellants' transaction with Arnold and Fowler was a usurious loan in violation of New York Penal Law § 190.40, since the $50,000 profit in one month would have amounted to interest at an annual rate of 384%.
 
 
 16
 Appellants' alleged wrongdoings do not bar their common law claims of fraud and negligent misrepresentation, discussed below, since New York law ordinarily permits an unclean hands defense only when plaintiff's reprehensible conduct is "directly related to the subject matter in litigation and the party seeking to invoke the (unclean hands) doctrine was injured by such conduct." Weiss v. Mayflower Doughnut Corp., 1 N.Y.2d 310, 316, 152 N.Y.S.2d 471, 474, 135 N.E.2d 208, 210 (1956). See, e. g., National Distillers Corp. v. Seyopp Corp., 17 N.Y.2d 12, 15-16, 267 N.Y.S.2d 193, 194-96, 214 N.E.2d 361, 362-63 (1966); Dinerstein v. Dinerstein, 32 A.D.2d 750, 750-51, 300 N.Y.S.2d 677, 678-79 (1st Dep't. 1969); American Cyanamid Co. v. Power Conversion, Inc., 71 Misc.2d 213, 214-15, 336 N.Y.S.2d 6, 9 (Sup.Ct. Westchester Co. 1972). Here, appellants' supposedly wrongful actions do not possess the requisite connection to the subject matter in litigation, i. e., alleged misrepresentations by Bankers Trust regarding the restrictions on the Equity National stock certificates. Cf. National Distillers and Chemical Corp. v. Seyopp Corp. (alleged violation of alcoholic beverage control law no bar to injunctive relief under fair trade law), supra; American Cyanamid Co. v. Power Conversion, Inc. (alleged fraud in obtaining patent no bar to claim of misappropriating trade secrets), supra. See generally 20 N.Y.Jur. Equity § 110 at 136-37, § 112 at 139-40 (1976 ed.). Still more persuasive, Bankers Trust was in no way injured by appellants' allegedly wrongful conduct, and thus may not invoke the unclean hands defense. See cases cited above; 20 N.Y.Jur., supra, § 111 at 138-39; 2 Pomeroy, Equity Jurisprudence § 399 at 94-99 (5th ed. 1941).[5] Finally, Bankers Trust has failed to meet a third condition for invoking the unclean hands defense under New York law, namely, the requirement of equal guilt. See Furman v. Furman, 178 Misc. 582, 586, 34 N.Y.S.2d 699, 704 (1941), aff'd, 262 A.D. 512, 30 N.Y.S.2d 516, aff'd 287 N.Y. 772, 40 N.E.2d 643; 20 N.Y.Jur., supra, § 115 at 142-43. Even a cursory balancing of the competing charges suggests that, under the circumstances of this case, the degree of appellants' alleged misconduct falls short of the claims lodged against Bankers Trust. The same conclusion follows with respect to the defense to appellants' Rule 10b-5 claim. Bankers Trust has cited no authority for the proposition that illegal acts in assisting a buyer to assemble the funds needed for the purchase of securities or in exacting a forbidden price for such assistance constitutes a defense for a person who has violated Rule 10b-5 in causing the plaintiff to accept a worthless pledge. The Supreme Court has not displayed much enthusiasm for the in pari delicto defense to claims for violation of federal statutes even when the plaintiff's violation was of the same statute under which he sought relief. Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (anti-trust laws). Decisions in this circuit have either rejected the in pari delicto defense to securities claims or have permitted it for a joint violation of the same statute usually in actions brought under Rule 10b-5 by "tippees" against "tippers" after lengthy analysis of underlying statutory objectives and a finding that plaintiff's wrongdoing was no less than that of the defendant. For denials of the defense, see Pearlstein v. Scudder & German, 429 F.2d 1136 (2 Cir. 1970) (violation of margin requirements); Weitzman v. Stein, 436 F.Supp. 895 (S.D.N.Y.1977) (unwitting implication in fraudulent scheme); Nathanson v. Weiss, Voisin, Cannon, Inc., 325 F.Supp. 50 (S.D.N.Y.1971) (Weinfeld, J.) (tippee-tipper action); cf. Katz v. Amos Treat & Co., 411 F.2d 1046 (2 Cir. 1969) (§ 12(1) of Securities Act of 1933). For decisions accepting the defense, see In re Haven Industries, Inc., 462 F.Supp. 172 (S.D.N.Y.1978) (tippee-tipper action); Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, 378 F.Supp. 112 (S.D.N.Y.1974), rev'd in part on other grounds, 540 F.2d 27 (2 Cir. 1976) (1933 Act counterclaim by underwriter against accounting firm alleging liability for misleading report); Wohl v. Blair & Co., 50 F.R.D. 89 (S.D.N.Y.1970) (tippee-tipper action); Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (S.D.N.Y.1968), aff'd 409 F.2d 1360 (2 Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969) (Regulation U, active deception on part of plaintiff). In the instant case, appellants' alleged delicts are insufficiently related to either the statutory violation at issue or the objectives underlying § 10(b) to support an in pari delicto defense under decisions most favorable to the defendant. Moreover, Bankers Trust would fare no better under the precedents of other circuits where that defense has been viewed more favorably. See, e. g., Tarasi v. Pittsburgh National Bank, 555 F.2d 1152 (3 Cir.), cert. denied, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977); Fogarty v. Security Trust Co., 532 F.2d 1029 (5 Cir. 1976); Malamphy v. Real-Tex Enterprises, 527 F.2d 978 (4 Cir. 1975).[6]
 
 
 17
 Despite this we would not reverse for admission of the evidence in regard to the false statements in Franklin National Bank documents since the point was not properly made or preserved. Appellants' only objection to the extensive testimony of Murfitt, Mallis and Kupferman on the subject came at one point in the cross-examination of Mallis when counsel for Bankers Trust characterized the Franklin Bank's action as "misrepresentations" and appellants' counsel objected only to the "characterization". Although Bankers Trust's counsel stressed the point in summation, appellants neither objected nor asked the judge to charge the jury to disregard the argument.[7] Indeed appellants do not even complain of this in their brief. The case is otherwise, however, with respect to the usury claims, where plaintiffs strongly objected.[8]
 
 
 18
 In addition to the general reluctance to allow unrelated "bad" actions by plaintiffs as in pari delicto defenses, this would be a singularly inappropriate case for allowing usury as an in pari delicto defense. It is by no means clear that the transaction between appellants on the one hand and Arnold and Fowler on the other was a "loan" within § 190.40 of the New York Penal Law. For a loan to be criminally usurious under that section, the alleged usurer must "knowingly" charge interest in excess of the legal rate. Appellants may well not have possessed the requisite criminal intent with respect to their $50,000 "profit" or "fee". Moreover, there is a strong presumption under New York law against a finding of usury. Cusick v. Ifshin, 70 Misc.2d 564, 568, 334 N.Y.S.2d 106, 110-111 (Civ.Ct. New York Co. 1972), aff'd, 73 Misc.2d 127, 341 N.Y.S.2d 280 (1973). Even if appellants' participation was usury, however, Bankers Trust was in no way adversely affected by plaintiffs' greed. Without endeavoring to essay any comprehensive formulation of the status of the in pari delicto defense in cases of this sort, we thus hold it was error to allow this testimony to go to the jury, and we cannot say that the error was harmless. Even if the jury was not expressly charged that appellants' allegedly usurious scheme was a defense to their claims, the jury could well have considered the usury charge in the absence of cautionary instructions.
 
 
 19
 Although this error is sufficient to require reversal of the defendant's verdict on the Rule 10b-5 claim, we cannot avoid deciding the point most strongly pressed by appellants on this phase of the case since it will be bound to arise on a new trial. This was the judge's charge that appellants bore the burden of establishing their own "due diligence and good faith", which he defined as exercising "reasonable care and prudence to learn the facts about the securities before entering the transaction" given all the surrounding circumstances, and conducting "a reasonable investigation upon learning of the notice of the Escrow Agreement printed on the shares." In addition, Judge Carter requested that the jury consider whether appellants or their agents "possessed other information (besides the restrictive legend on the share certificates) which should have alerted them to further investigation or caution." Id. While appellants' objections to the charge fell considerably short of perfection, we think they sufficed, although barely so, to call the propriety of this charge into question, as surely will be done at a new trial.
 
 
 20
 The argument is that since Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), imposed a scienter requirement for a finding of liability under Rule 10b-5, requiring scrutiny of plaintiff's conduct under a traditional due diligence-negligence standard is no longer appropriate, particularly in light of the general absence of such a requirement in cases of common law fraud. Responsive to this argument, four courts of appeals have modified or abandoned evaluation of plaintiff's conduct under a reasonable man standard in Rule 10b-5 actions. See Dupuy v. Dupuy, 551 F.2d 1005, 1013-24 (5 Cir.) (Wisdom, J.), cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977) with Mr. Justice White dissenting from the denial on the ground that the standard announced in Dupuy differed from our statement in Hirsch v. du Pont, infra; Sunstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1048-49 (7 Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); Holdsworth v. Strong, 545 F.2d 687, 692-95 (10 Cir. 1976), cert. denied, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977); Straub v. Vaisman & Co., 540 F.2d 591, 596-98 (3 Cir. 1976). Another circuit has signalled its rejection of the requirement. See Holmes v. Bateson, 583 F.2d 542, 559 n.21 (1 Cir. 1978). The most complete analysis is in Dupuy. That case, like Straub and Holdsworth, involved the alleged betrayal of a close relationship plaintiff's sale of a 47% interest in a closed corporation to his brother. The Dupuy district court entered judgment N.O.V. for defendant on the ground that plaintiff failed to exercise due diligence. The Fifth Circuit reversed, determining that plaintiff's conduct ought to have been evaluated by a "reckless" standard. 551 F.2d at 1020. Its rationale for the new standard included inter alia an analogy to the tort distinction between plaintiff's duties in actions for fraud and for negligent misrepresentation; the assertion of a greater federal interest (loosely inferred from the history of the Securities Exchange Act) in deterring intentional misconduct than in deterring negligent misconduct by investors, id. at 1019; a diminished need to limit the scope of 10b-5 liability in the wake of Ernst & Ernst ; and the observation "that most 10b-5 cases, when limited to their facts, are consistent with the distinction between intentional and negligent misrepresentation," i. e., they either held that plaintiff's negligence was irrelevant in light of defendant's intentional fraud, or they examined plaintiff's conduct under the negligence standard while failing to require scienter on the part of the defendant, a course no longer permissible under Ernst & Ernst. Following Prosser's definition of "willful", "wanton" or "reckless", Dupuy concluded that the appropriate standard for evaluating plaintiff's behavior in a Rule 10b-5 action was whether he
 
 
 21
 intentionally refused to investigate "in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."
 
 
 22
 551 F.2d at 1020.
 
 
 23
 As against this, Bankers Trust asserts that this circuit is committed to a contrary view by Hirsch v. du Pont, 553 F.2d 750, 762-63 (1977), and particularly by the statement that:
 
 
 24
 The securities laws were not enacted to protect sophisticated businessmen from their own errors of judgment. Such investors must, if they wish to recover under federal law, investigate the information available to them with the care and prudence expected from people blessed with full access to information.
 
 
 25
 Id. 763. Although district courts in this circuit have so held, see NBI Mortgage Investment Corp. v. Chemical Bank, (CCH) Fed.Dec.L.Rep. P 96,066 at 91,799 (S.D.N.Y.1977); Edwards & Hanly v. Wells Fargo Sec. Clearance Corp., 458 F.Supp. 1110, 1128 & n.12 (S.D.N.Y.1978), rev'd on other grounds but with the opinion approving Hirsch, 602 F.2d 478, 486 (2 Cir. 1979) petition for certiorari filed, 48 U.S.L.W. 3457 (1980),[9] the quoted statement in Hirsch should be limited to facts similar to those to which it was addressed, namely, where the comptroller of a large New York stock brokerage firm contemplating merger with another had received an answer to a questionnaire from the latter revealing "a possible massive capital deficiency" and failed to pursue the line of inquiry plainly suggested by this. This went far beyond negligence. The opinion did not discuss the bearing of Ernst & Ernst on a plaintiff's responsibility and the principal authority that was cited, Rochez Bros., Inc. v. Rhoades, 491 F.2d 402, 409-10 (3 Cir. 1974), cert. denied, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976), a pre-Ernst & Ernst decision, had been greatly restricted in light of Ernst & Ernst ten months before the Hirsch opinion, by Straub v. Vaisman & Co., Inc., supra, 540 F.2d at 596-98. While we have no quarrel whatever with the result in Hirsch and Edwards & Hanly on the facts there presented, we hold that in the light of Ernst & Ernst a plaintiff's burden is simply to negate recklessness when the defendant puts that in issue[10], not to establish due care.
 
 
 26
 III. The Court's Charge on the State Fraud Claim.
 
 
 27
 The judge charged seven elements of common law fraud, each of which plaintiffs were required to prove by "clear and convincing evidence." Of these, element 4 was justifiable reliance and element 5 was "(t)hat the plaintiffs or their agents acted with due diligence and in good faith." He also charged that the elements of common law fraud were identical to those of the Rule 10b-5 claim, save for the absence of one element (misrepresentation in connection with a sale of securities), the need for proof of all elements by clear and convincing evidence, and a requirement of express misrepresentation rather than mere omission. Thus the jury was effectively told that in addition to establishing justifiable reliance, plaintiffs were required to prove due diligence in investigation as a separate element of a New York fraud claim just as the court had specified for the 10b-5 claim. Appellants contend that this was error.
 
 
 28
 The threshold question is whether appellants effectively objected to the due diligence charge. Appellants made no mention of due diligence in their requested jury charges. Their requested charge 28 required a jury finding that they "justifiably relied" on the representations of Bankers Trust, and their requested charge 33 stated that justifiable reliance depended on whether the fact represented was such that a reasonable man would consider it important to making a decision, or, alternatively, on whether the person making the representation knew that it would be relied upon even if it were not such a fact.[11] This portrayal of justifiable reliance closely follows a portion of the model charge presented in 2 N.Y. Pattern Jury Instructions Civil, PJI 3:20 at 682-83 (1968). The judge announced that he was granting all but the second alternative of the reasonable reliance definition, i. e., the assertion that reliance might be justified if the person making the representation knew that it would be relied upon. After the charge appellants did not except to the court's introduction of due diligence as a separate element of the fraud charge, but did object to the statement that plaintiff had the burden of showing both due diligence and reliance. While plaintiffs' counsel could surely have done much better in apprising the court of the alleged error, we are inclined to think this was sufficient especially since there must be a new trial in any event.
 
 
 29
 Appellants are correct in their general assertion that New York requires proof of the traditional five elements of fraud: misrepresentation of a material fact, falsity of that representation, scienter, reliance and damages, see, e. g., Jo Ann Homes v. Dworetz, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803 (1969); 24 N.Y.Jur., Fraud & Deceit § 14 at 47-48 (1962), and does not recognize a separate due diligence element, much less one that must be independently proved by clear and convincing evidence. However, it is not so clear as plaintiffs would have it that New York law does not sometimes introduce due diligence not as a separate element for recovery of a fraud but as incidental to proof of justifiable reliance. Elsewhere the majority position is that plaintiff's negligence will not defeat a fraud claim, and a fortiori that plaintiff is not required to have conducted a due diligence investigation, see Prosser, Torts, § 108 at 115-18, Restatement (2d) Torts § 540, and this broad position is also supported by some New York authority. See Hiliel v. Motor Haulage Co., Inc., 140 N.Y.S.2d 51, 54 (Sup.Ct.Kings Co.1955), aff'd 1 A.D.2d 782, 149 N.Y.S.2d 224 (2d Dep't 1956) ("The law does not ordinarily impose upon a defrauded person the duty of investigating fraudulent claims . . . . Even negligence in ascertaining the true facts has been held not to bar the right of recovery"); N.Y.Jur., Fraud & Deceit § 176 at 248 (no duty of investigation). The bulk of New York authority, however, appears to follow a two-tier standard in determining plaintiff's duty, according to whether misrepresentations relate to matters that are, or are not, "peculiarly within the (defending) party's knowledge." When matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth. 24 N.Y.Jur., supra, § 176 at 247-48, indeed some cases have imposed liability in situations in which plaintiff could have determined the truth with relatively modest investigation. See, e. g., Todd v. Pearl Woods, Inc., 20 A.D.2d 911, 248 N.Y.S.2d 975 (2d Dep't 1964), aff'd, 15 N.Y.2d 817, 257 N.Y.S. 937 (1965) (failure to check defendant's representations against public records no bar to fraud claim); Albert v. Title Guarantee & Trust Co., 277 N.Y. 421, 14 N.E.2d 265 (1938) (failure to investigate land before accepting assignment of interest in mortgage no bar to fraud claim); cf. National Conversion Corp. v. Cedar Bldg. Corp., 23 N.Y.2d 621, 298 N.Y.S.2d 499, 246 N.E.2d 351 (1969) (lawyer's failure to investigate misrepresentation of mixed question of fact and law no bar to client's recovery under fraud claim). By contrast, when misrepresentations have been held to concern matters that were not peculiarly within the defendant's knowledge, New York courts have often rejected plaintiff's claim of justifiable reliance because
 
 
 30
 (if plaintiff) has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations. (Citations omitted).
 
 
 31
 Schumaker v. Mather, 133 N.Y. 590, 598, 30 N.E. 755, 757 (1892). See 24 N.Y.Jur., supra, § 176 at 245-47. Decisions holding that reliance on misrepresentations was not justified are generally cases in which plaintiff was placed on guard or practically faced with the facts. See, e. g., Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959) (buyer may not rely on misrepresentations in face of contract clause eschewing such reliance); Sylvester v. Bernstein, 283 A.D. 333, 127 N.Y.S.2d 746, aff'd, 307 N.Y. 778, 121 N.E.2d 616 (1954) (landlord may not rely on tenants' representation that apartment would not be used for residential purposes); Cudemo v. Al & Lou Construction Co., Inc., 54 A.D.2d 995, 387 N.Y.S.2d 929 (3d Dep't 1976) (plaintiff taking possession of garage one week prior to signing after making frequent inspections was not entitled to rely on representations that garage would accommodate her car). This case falls within the first group of New York cases rather than the second. The facts were readily within Bankers Trust's knowledge indeed the jury could permissibly have found that Silverman actually knew them all. In contrast appellants had been complete strangers to the Equity National-Kates transaction. We thus hold the charge as to appellants' being obliged to establish due diligence as an element of their pendent fraud claim was reversible error.
 
 
 32
 IV. Denial of Appellants' Negligent Misrepresentation Claim.
 
 
 33
 The judge denied appellants' requested jury charge No. 36, which read in relevant part:
 
 
 34
 Plaintiff's (sic) third claim is that Bankers Trust Company through Silverman was negligent in making the representation they made at the time of closing with respect to the status of the stock. One who makes a statement with knowledge that the statement is required for a serious purpose and with knowledge that it is made for the bene(fit) of another person who is expected to rely upon it and (who) may be damaged if it is false is under a duty to such other person (or the agent who represents him) to exercise reasonable care that the statement is correct.[12]
 
 
 35
 and refused to submit the issue of liability for negligent misrepresentation to the jury. Appellants excepted to the judge's actions.
 
 
 36
 During the colloquy over appellants' requested instruction, Bankers Trust made the same argument that it advances on appeal, namely, that New York does not recognize a negligent misrepresentation action without a fiduciary or contractual relationship between the parties. The district court accepted this argument and observed that a charge based on negligence would be impermissible "as a matter of law on the submission of evidence and the complaint."
 
 
 37
 The scope of the negligent misrepresentation action was defined for New York, and indeed, for the common law generally, by a series of decisions of the New York Court of Appeals during its golden age. Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275 (1922) (Cardozo, J.); International Products Co. v. Erie R. R. Co., 244 N.Y. 331, 155 N.E. 662 (1927) (Andrews, J.); Courteen Seed Co. v. Hong Kong & Shanghai Banking Corp., 245 N.Y. 377, 157 N.E. 272 (1927) (Pound, J.); Ultramares Corp. v. Touche, Nevin, & Co., 255 N.Y. 170, 174 N.E. 441 (1931) (Cardozo, J.). Recent years have seen some advance from Ultramares, supra, the most restrictive of these classic decisions. See White v. Guarente, 43 N.Y.2d 356, 362, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315 (1977); Restatement (2d) Torts § 552. The Court of Appeals there stated the basic elements of New York's negligent misrepresentation action to be:
 
 
 38
 As to duty imposed, generally a negligent statement may be the basis for recovery of damages, where there is carelessness in imparting words upon which others were expected to rely and upon which they did act or failed to act to their damage . . ., but such information is not actionable unless expressed directly, with knowledge or notice that it will be acted upon, to one whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all . . . ." (Citations omitted.)
 
 
 39
 White v. Guarente, supra, 43 N.Y.2d at 362-63, 401 N.Y.S.2d at 478, 372 N.E.2d at 319. See also International Products, supra, 244 N.Y. at 388, 155 N.E. 662.
 
 
 40
 Appellants presented ample evidence of the first three elements of negligent misrepresentation. Murfitt's and Arnold's testimony entitled a jury to conclude that Silverman misrepresented the negotiability of the Equity National stock while expecting appellants to rely on his representations, on one or both of two occasions during the alleged telephone conversation between Murfitt and Silverman on March 2, 1972, and at the closing itself. In addition, a jury might have found that reliance on these alleged misrepresentations was the proximate cause of appellants' loss. The inquiry, then, must be whether the negligent misrepresentation claim fails either because Silverman's alleged misrepresentations were not "expressed directly, with knowledge or notice that (they would) be acted upon," or because Bankers Trust was not "bound by some relationship of duty, arising out of contract or otherwise."
 
 
 41
 In the classic genre of cases limiting the scope of accountant liability, it is the first of these requirements which has been thought to pose the most formidable barrier to the plaintiff. See Ultramares, supra; White v. Guarente, supra. Here, by contrast, this requirement was amply met by the direct dealings between Silverman and appellants' representatives, coupled with Murfitt's testimony that Silverman was informed of appellants' identities and intentions. These appellants seek "redress, not as a mere member of the public, but as one of a settled and particularized class among the members of which the (information) would be circulated for (a) specific purpose," White v. Guarente, supra, 43 N.Y.2d at 363, 401 N.Y.S.2d at 479, 372 N.E.2d at 320. In short, granting appellants a negligent misrepresentation remedy in no way threatens to open the floodgates of liability as feared by Judge Cardozo in Ultramares, supra.
 
 
 42
 The remaining question is whether appellants had the requisite relationship to Bankers Trust. No New York decisions are precisely in point; in fact, New York's case law in this entire area is notably limited, perhaps because it has developed in the shadow of Ultramares. The general rule that applies in the majority of American jurisdictions at the present time is that the critical factor in the relationship between the parties is their reasonable expectations, not their formal legal relationship. This is reflected in the Restatement (2d) of Torts § 552 (1977), which states: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." See Cooper v. Jevne, 56 Cal.App.3d 860, 128 Cal.Rptr. 724 (1976); Security National Bank v. Lish, 311 A.2d 833 (D.C.App.1973); Williams v. Polgar, 43 Mich.App. 95, 204 N.W.2d 57 (1972); Moore v. Kluthe & Lane Insurance Agency, Inc., 89 S.D. 419, 234 N.W.2d 260 (1975); Obde v. Schlemeyer, 56 Wash.2d 449, 353 P.2d 672 (1960).
 
 
 43
 Whether New York would apply this general rule appears to us to be an open question. It is true that a literal reading of the language in Ultramares suggests that the New York courts would apply the more restrictive requirement of formal legal relationship to claims based on negligent misrepresentation. However, it must be remembered that the reference to legal relationship in Ultramares was essentially dictum, since the case was decided on the privity issue. A prior case decided by the New York Court of Appeals, also written by Judge Cardozo, suggests a rule that is more in consonance with the current rule in other jurisdictions. This case, Glanzer v. Shepard, supra, involved buyers of beans who overpaid a seller in reliance on a negligently inflated certificate of weight provided by a public weigher engaged by the seller. Judge Cardozo established the weigher's liability to the buyers thus injured by looking inter alia to the prospective use of the weigher's representations, their proximity to the "governance of conduct," and their appearance against prevailing standards of usage and fair dealing. 233 N.Y. at 239-41, 135 N.E. 275. This suggests a test quite similar to the one that currently appears in the Restatement, in that it focuses on the reasonable expectations of the buyers. Ultramares, decided nine years later, did not purport to overrule Glanzer ; in fact, it carefully distinguished Glanzer on the question of privity, and did not refer to that case's discussion concerning the origin of the legal duty.
 
 
 44
 In the most recent decision of the New York Court of Appeals to consider this issue, White v. Guarente, supra, such conflict as there may be between Glanzer and Ultramares was not explicitly resolved. The White Court defined negligent misrepresentation in terms of "carelessness in imparting words upon which others were expected to rely"; however, it limited the scope of liability with the requirement that the author of the words must be bound to the recipient by "some relation of duty, arising out of contract or otherwise, to act with care if he acts at all." 43 N.Y.2d at 362-363, 401 N.Y.S.2d at 478, 372 N.E.2d at 319. While the reference to duty suggests Ultramares, the emphasis on reliance, and the open-ended notion that the duty can be one arising "out of contract or otherwise," suggests the Glanzer notion of prevailing standards and buyer expectations. See Banker Trust Co. v. Steenburn, 95 Misc.2d 967, 991-92, 409 N.Y.S.2d 51, 66 (Sup.Ct.1978). See also Gediman v. Anheuser Busch, Inc., 229 F.2d 537, 543-44 (2 Cir. 1962).
 
 
 45
 Given the language of the few recent New York cases that have dealt with this issue, we predict that New York courts, when directly confronted with the issue, would hold that the Restatement's requirements that the seller be acting in the course of his business, that the information be supplied for the guidance of the buyer, and that the buyer justifiably relied on it, establish a sufficient relationship of duty between buyer and seller to support an action for negligent misrepresentation.
 
 
 46
 The criteria of Glanzer and the Restatement were met in this case. It was thus error to refuse to submit plaintiff's negligent misrepresentation claim to the jury.
 
 
 47
 The judgment is reversed and the cause remanded for a new trial consistent with this opinion.
 
 
 
 [1]
 This letter, which Mallis received after the closing, related that Mallis was to "advance" $156,728 toward the total purchase price of $181,728 of the Equity National shares, $25,000 of which had already been paid; that Mallis was to receive those shares as "collateral"; that within thirty days or less, Mallis was to be "reimbursed" for his initial outlay plus a "profit" of $50,000; that after remittance of his "investment" of $156,728 plus the $50,000 profit, Mallis was to return the Equity National shares to Arnold; and that the money "accruing" to Mallis would be paid from the proceeds of a sale of 100,000 shares of Merck & Co. stock in March, 1972
 
 
 [2]
 At trial, Silverman could recall reading only the last of the three letters from Equity National, dated April 14, 1971, which requested the return of the Equity National certificates. This letter made no mention of the Escrow Agreement but referred only to earlier correspondence, dated March 1 and March 4, 1971, that supported Equity National's claim on the stock. The March 1 letter referred to the terms of the Escrow and merger agreements; the March 4 communication served as a cover letter accompanying copies of these agreements, which were submitted at the request of Bankers Trust. Silverman acknowledged on cross-examination that the file he carried at the closing probably included copies of all correspondence regarding Equity National that had been received by the Delancey Street branch of Bankers Trust a category that presumably included both the March 1 and March 3 mailings from Equity National. Silverman also recalled having read the Escrow Agreement during March or April of 1971, but testified that he had been assured by both Kates and a Bankers Trust loan officer that Kates had met the conditions of that agreement
 
 
 [3]
 We further said, 568 F.2d at 830:
 Appellants were purchasers by virtue of their acceptance of the pledge by Arnold and Fowler; and Bankers Trust was a seller by virtue of its release of the Kates' pledge.
 In the Supreme Court appellants disavowed this and "took the position that 'the mere release of a pledge is (not) a sale' " at all, see 435 U.S. at 388, 98 S.Ct. at 1121. It was this change in theory that led the Court to dismiss the writ as improvidently granted. In any event we do not believe the quoted language, written in the absence of detailed proof of what occurred, can mean that this court committed itself to the view that there was a sale from Bankers Trust to appellants no matter what the evidence might show. On the record before us no such transaction existed.
 
 
 [4]
 Bankers Trust raised this defense against all three of appellants' claims. For convenience we shall discuss them together
 
 
 [5]
 To be sure, New York courts have relaxed the injury requirement when a party seeks to enforce an inherently illegal arrangement or an agreement whose performance by one side is marred by gross illegality. See McConnell v. Commonwealth Pictures Corp., 7 N.Y.2d 465, 199 N.Y.S.2d 483, 166 N.E.2d 494 (1960) (summarizing case law on illegal contracts and extending rule of nonenforcement to instances where contract performance was tainted by commercial bribery); Palumbo v. Palumbo, 55 Misc.2d 264, 284 N.Y.S.2d 884 (1967) (Meyer, J.) (despite case law in other areas, uninjured defendant may invoke unclean hands defense when plaintiff seeks performance of agreement to recover property originally conveyed to defraud creditors). Appellants are not seeking the enforcement of a private agreement tainted by illegality; they are bringing an action in tort
 
 
 [6]
 These cases, like decisions within the Second Circuit approving the in pari delicto defense, cited supra, look to a conspiratorial or quasi-conspiratorial relationship between plaintiff and defendant, relatively equal culpability as between the parties, and whether allowing the defense will further the enforcement policies of the securities acts. The most widely cited "rule" for determining the availability of the defense was framed by Woolf v. S. D. Cohn & Co., 515 F.2d 591, 521 F.2d 225 (on petition for rehearing) (5 Cir. 1975), vacated on other grounds, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976) (Wisdom, J.):
 the fault of the parties must be "clearly mutual, simultaneous, and relatively equal". (quoting James v. Du Breuil, 500 F.2d 155, 160 (5 Cir. 1974)) Moreover, the effect on the investing public or on the implementation of important features of the regulatory scheme must be so small as to permit the Court to conclude that allowing the defense would not interfere with "the objective of the securities laws (of) increasing the protection to be afforded to the investing public", as Judge Aldrich noted in Kuehnert (v. Texstar Corp., 412 F.2d 700, 704 (5 Cir. 1969)).
 521 F.2d at 227; 515 F.2d at 604. In the instant case, the parties alleged wrongdoings most clearly lack the requisite "mutuality". They were unrelated in purpose, see Woolf, supra, 515 F.2d at 604, and they were not committed jointly or as the acts of confederates, see Lawler v. Gilliam, 569 F.2d 1283, 1291-93 (4 Cir. 1978) (following Woolf rule). The only case in which a court of appeals has even considered the possibility that an equal delict outside the ambit of the securities laws might block a Rule 10b-5 claim involved a collaborative offense, namely deception of a probate court that was an integral part of the course of conduct underlying the plaintiff's Rule 10b-5 claim. See Fogarty v. Security Trust Co., supra.
 
 
 [7]
 Prior to summations, appellants asked for, and were refused, an instruction to the effect that Franklin National was legally entitled to loan appellants funds for the purpose of financing the Equity National transaction. However, this failed to address the claim of misrepresentation to appellants' action against Bankers Trust
 
 
 [8]
 Mallis and Kupferman were both questioned extensively about whether their roles in the Equity National transaction could be characterized as those of lenders; both were asked if they were aware of the state usury laws; and in summation, counsel for Bankers Trust stressed that the "interest" which appellants had planned to charge "might raise a question in ones' mind whether that transaction might be usurious." Appellants' counsel objected to the use of the terms "loan" and "interest" during the cross-examination of Mallis and Kupferman. He repeated these objections during a colloquy over jury charges, and pointed out that the usury argument was a wholly spurious defense to appellants' claim even assuming arguendo that appellants' participation was a loan
 
 
 [9]
 The facts in Edwards & Hanly would have led to dismissal under the Dupuy standard. Particularly apt is the late Judge Gurfein's quotation, 602 F.2d at 489, from 2 Kent, Commentaries 485:
 The common law affords to everyone reasonable protection against fraud in dealing, but it does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information.
 
 
 [10]
 Two commentators have urged that the defendants should have not only the burden of placing plaintiff's recklessness in issue but the ultimate burden of persuasion. See Wheeler, Plaintiff's Duty of Due Diligence Under Rule 10b-5: An Implied Defense to an Implied Remedy, 70 Nw.U.L.Rev. 561, 595-96 (1976); Note, a Reevaluation of the Due Diligence Requirement for Plaintiffs in Private Actions Under SEC Rule 10b-5, 1978 Wisc.L.Rev. 904, 922-24 (1978). Although perceiving the arguments for this position, for the time being we are content with Judge Wisdom's formulation in Dupuy
 
 
 [11]
 Such language goes, of course, to materiality rather than the justifiability of reliance
 
 
 [12]
 With minor changes, this requested charge recites the model charge set forth in 1 N.Y. Pattern Jury Instructions Civil, PJI 230 at 542 (2 ed. 1974). See also Bankers Trust Co. v. Steenburn, 95 Misc.2d 967, 991-92, 409 N.Y.S.2d 51, 66 (Sup.Ct.Chautauqua Co.1978). Not all elements of negligent misrepresentation are included in the model charge. Whether a relationship exists between the parties that will bring the negligent misrepresentation doctrine into play, see discussion infra, is generally treated as a question of law for the courts. 1 N.Y. Pattern Jury Instructions, supra, PJI 230 at 544 (Comment)