MEI INTERNATIONAL, INC., Plaintiff,

v.

SCHENKERS INTERNATIONAL
FORWARDERS, INC.,
Defendant.

No. 88 Civ. 1429 (CBM).

United States District Court,
S.D. New York.

July 15, 1992.

Memorandum Opinion re Motion to
Vacate of Aug. 10, 1992, Oct. 2, 1992.

Myron Beldock, Beldock Levine & Hoffman, New York City, for plaintiff.

William R. Fried, Mendes & Mount, New York City, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

This case involves the allegedly negligent advice given to plaintiff, MEI International, Inc. (MEI), by defendant, Schenkers International Forwarders, Inc. (Schenkers), regarding the circumstances which permit an original importer to obtain a duty drawback under United States custom law. This action for damages was tried to the court on December 2, 3, 4, and 5, 1991. The court now makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1. Plaintiff MEI is a Panamanian corporation. One aspect of MEI's business is the purchase and sale of goods. In the transactions relevant to this case, William G. Stern, a resident of London, England and a non-practicing member of the New York State Bar, acted as an agent on behalf of MEI and a profit-participant in MEI's buying and reselling of FILA goods. Mr. Jeffrey Hendrick, who resides in London, England and was affiliated with MEI from 1984 to 1986, also acted as an agent of MEI under the authority of Mr. Stern.

2. Defendant Schenkers, a New York corporation, is a customs broker and freight forwarder licensed by the United States Treasury Department and the Federal Maritime Commission. Schenkers is engaged in the business of advising and assisting clients on the importation and exportation of goods into and from the United States and has experience and expertise in United States customs regulations and procedures.

3. During the period of August, 1984, through December, 1985, MEI purchased five lots of unsold sportswear from FILA Sports, SPRL ("FILA"), an Italian corporation. Schenkers advised MEI with respect to the import/export implications of the first three lots purchased by MEI from FILA.

4. The first two lots that MEI purchased from FILA consisted of garments that were to be shipped from Italy into the United States. The first lot contained approximately 351,000 garments and had a purchase price of approximately two million dollars. (Tr. 32) The second lot was substantially smaller, containing approximately 50,000 garments with an invoice value of approximately $800,000.00. (Tr. 38)

5. Because MEI was unfamiliar with the process of importation and customs, MEI retained Schenkers to advise and assist MEI in importing the first two FILA lots into the United States. (Tr. 35–36)

6. MEI, through Mr. Stern, first met with Schenkers regarding the first lot of FILA merchandise sometime during the latter of half of 1984. (Tr. 34) At that time, Mr. Stern requested that Schenkers provide MEI with "comprehensive service" and indicated that MEI would require such services from Schenkers on a continuing basis. (Tr. 36)

7. Schenkers fully performed the requested services for the first two FILA lots and rendered invoices to MEI containing standard contract terms.[1] MEI paid Schenkers in full for its services. The parties do not dispute their respective conduct with regard to the first two lots.

8. The present dispute arises from the conduct of the parties with respect to the third lot of FILA merchandise purchased by MEI, referred to here as the "export lot." The export lot consisted of first quality, out of season FILA sportswear, similar to that contained in the first two lots of FILA goods. The garments contained in the export lot were manufactured in Italy and imported into the United States by FILA in 1983 and 1984, at which time customs duties had been paid.

9. In December of 1985, M.E.I. agreed to purchase the export lot, which consisted of approximately 60,000 garments, from FILA's California subsidiary for the sum of $300,000.00. (Pl.Exh. 1, 2) At the time of the December purchase agreement, the export lot was located in California.

10. The purchase agreement between MEI and FILA regarding the export lot, as stated in telexes dated December 11 and 12, 1985, required MEI to accept that portion of the goods imported into the United States in 1983 and 1984 "in a Free Zone or in Panama". (Pl.Exh. 1, 2) The purpose of this requirement was to enable FILA to reclaim customs duties in the amount of $80,000 that it had previously paid on the original importation of the goods. It was the understanding of MEI and FILA that the goods on which FILA had paid import duties in 1983 and 1984, a total of 23,159 pieces of merchandise, would be exported from the United States to enable FILA to reclaim the duties previously paid. (Pl. Exh. 7, 9; Tr. 52)

11. At the time the goods in the export lot were originally imported into the United States by FILA, FILA had paid customs duties based on the original purchase price of the goods. The agreement purported to enable FILA to reclaim the duties originally paid by requiring MEI to accept shipment in a free trade zone or Panama. MEI would then pay customs duties based on the new commercial invoice. Because the unsold seasonal goods would be significantly less costly when MEI accepted them than they were when originally imported, the duties paid by MEI would be substantially lower than the duties previously paid by FILA.

12. In early March of 1986, M.E.I. began consulting with Schenkers for advice and expertise regarding the handling of the export lot, including the U.S. customs aspects of the transaction, the location and consequences of utilizing a foreign trade zone or the United States equivalent of a bonded warehouse, and the drawback of duties by the original importer.

1. The court previously ruled that the terms and conditions in the contracts governing the first two lots are not dispositive of the transaction involving the export lot, which is not governed by any written contract between MEI and Schenkers. *Memorandum Opinion and Order,* 88 Civ. 1429 (SWK), 1990 WL 83524 (S.D.N.Y. June 7, 1990). Specifically, the court ruled that the provision in the written contracts regarding the first two lots which limits Schenkers' liability to $50.00 does not apply to the present lawsuit. *Id.*

13. MEI contacted Schenkers with respect to these services because Schenkers had been the freight forwarder for the two prior FILA shipments, and MEI believed that it had an ongoing relationship with Schenkers with respect to subsequent shipments. (Tr. 66–67)

14. In March of 1986, Mr. Stern telephoned Schenkers on behalf of MEI and spoke with Ms. Lisa Malwitz, then an assistant import manager for Schenkers. Mr. Stern inquired as to whether there existed in the United States the equivalent of "bonded warehouses" which exist in Europe, and if so, under what conditions such bonded warehouses could be used. (Tr. 58)

15. At this time, Mr. Stern informed Ms. Malwitz that MEI required this information to facilitate a transaction whereby MEI would export certain goods which they had purchased from FILA and which were located in FILA's warehouse in California in order to enable FILA to obtain a duty drawback on the merchandise. (Tr. 63) Mr. Stern told Ms. Malwitz that MEI did not yet know the identity of the country to which the goods would be exported. (Tr. 63–64)

16. During these telephone conversations, Ms. Malwitz told Mr. Stern that if the goods were shipped to a foreign trade zone, the previous importer would then be able to obtain a duty drawback on the goods, even though MEI did not yet know the country to which the goods would ultimately be sent. At the same time, Ms. Malwitz provided Mr. Stern with the address of a foreign trade zone in Long Beach, California. (Tr. 63–64) Subsequently, at a time prior to March 26, 1986, Ms. Malwitz sent MEI a telex confirming the address of the foreign trade zone. (Tr. 59–60; Pl. Exh. 8)

17. On or about March 26, 1986, FILA advised MEI of certain details concerning the 23,159 pieces of clothing in the export lot and the required letter of credit. (Pl. Exh. 7) At this time, MEI advised FILA of the address information for the Foreign Trade Zone, and gave other information regarding financial and other aspects of the transaction. (Pl. Exh. 9)

18. By mid to late March of 1986, MEI had not yet found a buyer for the export lot. At the time, MEI was considering exporting the goods to Great Britain or Australia.

19. On April 10, 1986, Mr. Stern sent Ms. Malwitz a telex referring to Mr. Stern's earlier conversation with Ms. Malwitz and advising her that MEI had arranged to have FILA ship the goods to the foreign trade zone in Long Beach, California. (Pl. Exh. 10) The telex stated that MEI was in the process of opening a letter of credit to FILA, and that FILA was expected to deliver in two weeks time. (Pl. Exh. 10) In the same telex, Mr. Stern requested that Schenkers act as "honest broker" in providing MEI with the details necessary to complete the transaction, such as storage rates and insurance arrangements. (Pl. Exh. 10)

20. Shortly thereafter, Ms. Malwitz responded by sending MEI a telex containing the requested information. Ms. Malwitz also informed MEI that Schenkers was currently looking into arranging for insurance coverage for the export lot with their own insurance company. (Pl. Exh. 11)

21. As of April 11, 1986, MEI had not yet decided upon a buyer for the export lot, and did not yet know where the goods would be delivered. (Tr. 71–72) Sometime during the thirty-day period between mid-April and mid-May of 1986, MEI began to consider selling the export lot to Ladies Apparel, a company located in California. Schenkers knew of Ladies Apparel because it had been involved with Schenkers in the transactions involving the first two FILA lots. (Tr. 72–73) Mr. Hendrick handled the arrangements on behalf of MEI regarding the proposed sale of the export lot to Ladies Apparel. (Tr. 73)

22. During the period of time that MEI was considering selling the export lot to Ladies Apparel, Mr. Hendrick had several phone conversations with Ms. Malwitz in which he explained that MEI was purchasing FILA goods located in the United States and needed confirmation from Schenkers that FILA could re-export the goods and that MEI could then re-import the goods based on the new commercial invoice. (Tr. 236) In these conversations,

Mr. Hendrick told Ms. Malwitz that MEI was planning on re-importing the goods into the United States and selling them to Ladies Apparel in California. (Tr. 237–38)

23. Mr. Hendrick subsequently telephoned Schenkers and requested to speak with Ms. Malwitz. Because Ms. Malwitz was unavailable, Mr. Hendrick spoke with Mr. Paul Fifield, a Schenkers customer service representative supervised by Ms. Malwitz. Mr. Hendrick and Mr. Fifield had several telephone conversations during which Mr. Hendrick asked what legalities were involved in enabling a previous importer to obtain a duty drawback on goods currently in the United States and which would be resold in the United States. After these telephone discussions between Mr. Hendrick and Mr. Fifield, Mr. Fifield sent a telex to Mr. Hendrick, an M.E.I. representative, which stated in relevant part:

> RE; Various Telephone Discussions— Confirmation of Legalities of Importing FILA Goods After Exportation form [sic] U.S.
>
> Have confirmed with U.S. Customs here in U.S. that it is o.k. to re-import the sportswear goods per our telecon at the new amount of your commercial invoice. Previous importer can claim a duty drawback based on his original importation. Legalities are involved only if you did not buy merchandise abroad, but had purchased them from him here in the U.S.A. As long as you have purchased goods abroad, this shipment will be handled as a normal import, with duties being determined on value of goods per your commercial invoice. (Pl. Exh. 12)

Mr. Fifield had no further conversations with Mr. Hendrick after sending this telex. (Tr. 184)

24. The copy of the telex introduced as Plaintiff's Exhibit 12 does not contain a date and is not an original. It is Schenkers' policy and practice to place dates on all original telex sent by Schenkers to indicate the date that the telex was sent. Schenkers never produced the original Fifield telex, or any other documentation with respect to the MEI transaction, notwithstanding its receipt of document requests and trial subpoenas from MEI. Mr. Fifield testified that Schenkers regularly kept copies of all telexes sent by Schenkers. (Tr. 162–164) Ms. Malwitz testified that she had kept a file on the MEI transactions, and that she had given the file to Schenkers' lawyers.

25. The court finds that the Fifield telex sent to MEI was written after MEI had advised Schenkers that it was considering selling the export lot to Ladies Apparel. The telex was sent at a time when Ms. Malwitz was out of the office, either on vacation or out on sales calls. (Tr. 174–175, 228) According to Schenkers' business records, Ms. Malwitz was on vacation from May 5 through May 9, 1986. At the time that he sent the telex, Mr. Fifield knew that MEI needed the requested information in order to make a decision. (Tr. 169) A letter from Schenkers to MEI dated April 16, 1987, admits that MEI had advised Schenkers of its plans to sell the export lot to Ladies Apparel before the Fifield telex was sent. (Pl. Exh. 25)

26. After Ms. Malwitz returned to the office, Mr. Fifield gave her a copy of the telex that he sent to MEI. (Tr. 175) Ms. Malwitz then checked the substance of the telex with Mr. Fred Aguero, a customs expert at Schenkers, and determined that the information contained in the telex was correct. (Tr. 224) Ms. Malwitz resumed responsibility for the MEI transaction and Mr. Fifield had no further involvement with MEI. (Tr. 176)

27. MEI understood the Fifield telex to mean that MEI, having identified Ladies Apparel as a potential buyer, could ship the goods to a foreign trade zone and then "re-import" them into the United States, paying customs duties based on the new commercial invoice, and enabling FILA to obtain a duty drawback. (Tr. 80–81)

28. In late April or early May of 1986, after receiving the Fifield telex, M.E.I. agreed to sell the export lot to Ladies Apparel in reliance on the information contained in the Fifield telex. (Tr. 141, 240) MEI set the price of the export lot based on the cost of the goods, assuming FILA would be able to obtain a duty drawback, plus a profit. (Tr. 240)

29. In early to mid-May of 1986, Mr. Hendrick informed Schenkers of its agreement to sell the export lot to Ladies Apparel, and that the agreement called for the delivery of the merchandise by May 31, 1986. (Tr. 241–242; Pl. Exh. 13) The export lot consisted of summer merchandise which had to be delivered on or about May 31, 1986 in order to be marketed for the 1986 season.

30. In or about the third week of May, 1986, Schenkers advised M.E.I. that there was a problem with MEI's plan to import FILA goods back into the United States after exporting them to a foreign trade zone for the purpose of enabling the previous importer to claim a duty drawback. (Tr. 243) At the same time, Schenkers advised M.E.I. that they were attempting to find a solution to the problem. (Tr. 243)

31. MEI responded to Schenkers with a telex from Mr. Hendrick dated May 23, 1986, which stated in relevant part:

Attn: Lisa Malvitz [sic] and Fred
RE: 22,000 Units to Reimport into the States
I appreicate [sic] your efforts in fianalis-ing [sic] a solution to this stock, but for good order I will summarize the recent events.
After lengthy conversations with Paul Fifield and a further wait of 5 days for your telex you confirmed that we had no problem in reimporting the stock and paying duty on a commercial invoice.
You were aware that we had contractually agreed to deliver by 31 May 1986 at the latest.
Having acted on your advice we are now at risk with this stock. Fred says he needs time to find a solution but after 31 May I possibly will have no buyer anyway. I urge you to spare no effort. I will have a problem selling summer merchandise in June. (Pl. Exh. 13)

32. In a telex dated May 27, 1986, Schenkers acknowledged receipt of the above telex from MEI and apologized for any inconvenience. The telex assured M.E.I. that Schenkers was making every attempt to expedite the transaction. (Pl. Exh. 14) The telex also referred MEI to the prior Fifield telex and quoted the substance of the relevant advice. (Pl. Exh. 14)

33. After receiving the May 27, 1986 telex from Schenkers, Mr. Hendrick discussed the problems that had emerged regarding the export lot with Mr. Stern. Mr. Stern, on behalf of MEI, conducted all further communications with Schenkers regarding the export lot from that point on. (Tr. 244–45)

34. On May 29, 1986, Schenkers' senior corporate vice president, William Holmes, informed Mr. Stern by telephone that the contemplated transaction could not be carried out because goods which enter a foreign trade zone become zone restricted and cannot be re-imported back into the same zone. (Tr. 90–91, 386) As a result of this conversation, Mr. Stern flew to New York and met with Schenkers on June 3, 1992, in an attempt to reach a solution to the problem. (Tr. 92) At that time, Mr. Stern was handed a telex dated May 29, 1986, which stated Schenkers' reasons for withdrawing from the transaction contemplated by MEI. (Tr. 95–96; Pl. Exh. 16)

35. After learning of the zone-restricted status the goods would acquire once they were shipped to a foreign trade zone, Mr. Stern suggested shipping the goods to Canada, and then re-importing them to facilitate the intended duty drawback to FILA. Schenkers responded that to export the goods to another country and reimport them without having the goods enter the stream of commerce of the country to which they were exported would constitute a sham transaction and would be illegal under United States custom laws. (Tr. 98–99)

36. The June 3 meeting failed to produce a solution whereby FILA could obtain a duty drawback and MEI could perform its agreement to sell the export lot to Ladies Apparel. MEI was unsuccessful in its attempt to find another broker to handle the transaction. (Tr. 97–98)

37. Schenkers withdrew from representing MEI with respect to the export lot but continued to assist MEI with later transactions. (Tr. 110–111)

38. After unsuccessful efforts by MEI to renegotiate the terms of the agreement

to purchase the export lot from FILA, MEI proceeded to sell the goods to Ladies Apparel. (Tr. 100–101) In addition to the contract price for the export lot, MEI paid FILA the additional sum of $80,000, the amount of the anticipated duty drawback FILA had expected to receive, in lieu of its obligation to accept the goods in a foreign trade zone. (Tr. 100–103; Pl. Exh. 18, 19) MEI calculates that it would have owed $30,000 in customs duties and shipping costs and expenses had it been able to re-import the goods based on the amount of the new commercial invoice, as planned. (Tr. 103–104) MEI therefore sustained damages in the amount of $50,000, the difference between the $80,000 that it paid to FILA and the $30,000 it would have had to pay in customs duties and related costs on re-importation of the merchandise, plus interest.

39. MEI asserted its claim against Schenkers first orally and then by letter to Schenkers dated June 27, 1986. (Pl. Exh. 20) Schenkers rejected MEI's claim by letter dated April 16, 1987. (Pl. Exh. 25)

## CONCLUSIONS OF LAW

1. The New York Court of Appeals set forth the elements of a negligent misrepresentation claim in *White v. Guarente*, 43 N.Y.2d 356, 362–63, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (1977):

As to duty imposed, generally a negligent statement may be the basis for recovery of damages, where there is carelessness in imparting words upon which others were expected to rely and upon which they did act or failed to act to their damage ... but such information is not actionable unless expressed directly, with knowledge or notice that it will be acted upon, to one to whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all....

■ 2. There is no cause of action for negligent misrepresentation under New York law absent some special relationship of trust or confidence between the parties giving rise to a duty on the part of the defendant. *Accusystems, Inc. v. Honeywell Info. Systems*, 580 F.Supp. 474, 480 (S.D.N.Y.1984). The Second Circuit has noted that although New York case law addressing the question of the sufficiency of such a relationship is "notably limited", New York courts would probably follow the majority rule set forth in Section 552 of the Restatement (2d) of Torts. *Mallis v. Banker's Trust Co.*, 615 F.2d 68, 83–84 (2d Cir.1980). Section 552 of the Restatement (2d) of Torts provides:

One who, in the course of his business, profession, or employment, or in any other transaction in which he had a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*See also Crabtree v. Tristar Automotive Group, Inc.*, 776 F.Supp., 155 (S.D.N.Y. 1991) (stating a buyer-seller relationship creates a duty of care with regard to communications between the parties when the seller is acting in the course of his business, the information is supplied for the guidance of the buyer, and the buyer justifiably relied on it).

■ 3. The existence of a duty on the part of a defendant in a negligent misrepresentation case does not depend upon the existence of a formal contractual relationship but rather on the reasonable expectations of the parties. *Mallis v. Banker's Trust Co.*, 615 F.2d at 82; *cf. Banker's Trust Co. of Western N.Y. v. Steenburn*, 95 Misc.2d 967, 409 N.Y.S.2d 51, 66 (1978) ("where one makes a statement with knowledge that the statement is required for a serious purpose, and that it is made for the benefit of another person, who is expected to rely upon it and may be damaged if it's false, the person making such statement is under a duty to the person expected to rely upon it, to exercise reasonable care that the statement made is correct."). In order to state an action for negligent misrepresentation where contractual privity is absent, the defendant must be aware of a specific party or class of parties intended to rely on the statement, and the alleged misrepresentations must

have been communicated directly to the plaintiff with knowledge that the plaintiff would rely on them. *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985); *Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054, 1062 (S.D.N.Y.1989). Moreover, the plaintiff's reliance on the statements must have been the end aim of the transaction. *Credit Alliance, supra*, 65 N.Y.2d at 549, 493 N.Y.S.2d at 442, 483 N.E.2d at 117.

4. Although not governed by contract, the relationship between MEI and Schenkers, whereby MEI requested and received Schenkers' advice and expertise concerning customs matters relating to the export lot, satisfies the requirements under New York law for imposing a duty on defendant to exercise reasonable care in providing plaintiff with customs advice. Schenkers holds itself out as an expert in United States customs regulations and procedures. MEI, which was not experienced in United States customs law, initiated a business relationship with Schenkers whereby it would rely on Schenkers' customs and freight-forwarding expertise. When MEI contacted Schenkers for advice as to the export lot, MEI specifically requested that Schenkers act as "honest broker" in connection with the transaction. Schenkers responded by sending M.E.I. a telex containing further information. The prior established relationship and course of dealing between MEI and Schenkers involving the first two FILA lots created a reasonable expectation between the parties that MEI would make business decisions regarding the export lot based on Schenkers' professional advice. *See Mallis v. Banker's Trust Co.*, 615 F.2d 68, 83 (2d Cir.1980). Moreover, Schenkers communicated the alleged misrepresentations directly to MEI with the intention that MEI would rely on the advice and with the knowledge that this intended reliance was the reason that Schenkers was being consulted. Schenkers, therefore, had a duty to use reasonable care to ensure that the advice it provided MEI regarding the export lot was correct.

5. Schenkers breached this duty when it made certain misrepresentations which M.E.I. relied upon to its detriment. Schenkers falsely represented that no legalities would affect the right of the previous importer to claim the duty drawback if MEI had purchased the goods abroad and not in the United States. As long as MEI purchased the goods abroad, Schenkers continued, the goods could be re-imported and handled as a normal import with duties based on the new commercial invoice amount. This advice was misleading in the context of what Schenkers knew about MEI's proposed transaction involving the export law. Schenkers knew that the goods were currently in the United States, that MEI was planning on "exporting" them to a foreign trade zone in Long Beach, California, and that MEI was considering selling the goods to a California buyer.

6. The advice was incorrect because legalities did affect the proposed transaction whether or not the goods were purchased in the United States. As Schenkers later told MEI after MEI had agreed to sell the goods to Ladies Apparel, merchandise cannot be exported from the United States and then re-imported so as to enable the previous importer to obtain a duty drawback unless the goods enter the stream of commerce of the foreign country to which they are exported. Exporting the goods in order to obtain a duty drawback and then immediately re-importing them for resale constitutes a sham transaction under U.S. customs laws. Moreover, Schenkers failed to inform MEI that placement of the goods in a foreign trade zone, as contemplated by MEI and Schenkers, would cause the goods to be zone-restricted and would prevent MEI from re-importing the goods into the United States. Finally, had the transaction proceeded as contemplated under the agreement between MEI and FILA, it is not clear that the goods would have been "purchased in the United States", because MEI would have accepted delivery of the goods in a foreign trade zone or in Panama.[2] However, contrary to Schenkers' rep-

**2.** Under UCC § 2–401(2), title to goods passes at the time and place that the seller completes

performance with respect to the physical deliv-

resentations in the Fifield telex, legalities would nevertheless affect the right of the previous importer to claim a duty drawback and would affect the ability of MEI to re-import the goods into the United States and pay customs duties based on the new commercial invoice.

7. MEI relied on the negligent advice received from Schenkers. Upon receiving Schenkers' responses to its inquiries, MEI reasonably concluded, based on the information that Schenkers had about the contemplated transaction, that it could place the goods in a foreign trade zone and then resell them to Ladies Apparel, thereby enabling FILA to reclaim the duty paid on the original importation. As a result of this understanding, MEI offered the export lot to Ladies Apparel and priced the goods with the understanding that the transaction would enable FILA to claim the duty drawback. (Tr. 240)

8. MEI was damaged by its reliance on Schenkers' advice in the amount of $50,000.00. MEI did not learn that it would be impossible to complete the transaction as planned until after it had agreed to sell the goods to Ladies Apparel. Because the sale of the export lot to Ladies Apparel did not permit FILA to reclaim the duty drawback as required under the contract between MEI and FILA, MEI was forced to pay FILA an additional $80,-000.00, representing the amount FILA would have been able to obtain as a duty drawback. MEI would have incurred $30,-000.00 in costs if it had been able to enable FILA to obtain a duty drawback as contemplated by MEI and Schenkers. MEI therefore sustained damage in the amount of $50,000.00.

M.E.I. is entitled to judgment in the amount of $50,000.00, plus interest, costs and disbursements.

## MEMORANDUM OPINION RE MOTION TO VACATE OF AUGUST 10, 1992

Defendant Schenkers' motion of August 10, 1992 to vacate this court's judgment in this action which was entered on July 29, 1992 or, in the alternative, for a new trial on the issue of damages, is denied for the following reasons:

### Damages

The court, in denying said motion, supplements its prior findings on the issue of damages as follows:

William Stern testified that he had been told by FILA that it was seeking a duty drawback of $82,000 which FILA agreed to round off at $80,000 (TR 102).

A telex dated June 11, 1986 from FILA Italy to Stern confirmed that MEI would pay FILA an additional $80,000 and amend its letter of credit accordingly (Exhibit 18; TR 103).

A telex dated June 9, 1986 from MEI's bank to FILA's bank confirmed the amendment of MEI's letter of credit in favor of FILA increasing the letter of credit by $80,000 (Exhibit 19; TR 103). This document confirmed the $80,000 payment, as Stern testified (TR 101–103).

Stern's letter dated June 27, 1986 to the President and Chief Executive Officer of Schenkers (Exhibit 20; TR 105) reiterated that Mr. Angiolo Tacci of FILA had told Stern that the amount of the drawback was $82,000 (which Stern rounded to $80,000).

Williams Holmes, Schenkers' vice-president, testified that Schenkers was FILA's custom's broker since 1982 (TR 379), that FILA was an honorable company, and that there was no reason to doubt FILA's information that $80,000 was the amount of the duty drawback (TR 406). He also testified that he was aware since 1986 that MEI was claiming it had paid FILA an additional $80,000 as a result of FILA's inability to get the duty drawback (TR 406–407).

These facts and circumstances logically led to the conclusion that FILA and MEI had agreed that the price set for the export lot was based on FILA being able to obtain an $80,000 duty drawback and that, when the duty drawback could not be obtained,

---

ery of the goods. The contract between MEI and FILA required MEI to accept delivery of the goods in a foreign trade zone or in Panama. Consequently, had the contract been performed as contemplated by MEI based on Schenkers' advice, MEI would have received title when the goods were delivered to the foreign trade zone and attained zone-restricted status.

MEI accordingly paid FILA an additional $80,000.

The fact that Schenkers disagrees with the court's findings and conclusions as to damages hardly gives it a basis to argue insufficiency of evidence. The proof outlined above amply established MEI's out-of-pocket loss and satisfied MEI's burden of proof.

### Mitigation of Damages

As early as June 27, 1986,[1] MEI took the position that its $80,000 gross damages were to be reduced by $30,000: $20,000 for the customs duties it would have paid on reimportation of the export lot and $10,000 for transportation costs. MEI's mitigation calculation was continuously maintained throughout the litigation and was never materially challenged by Schenkers.

Stern testified that he made his calculation by taking the average customs duty he paid on the first two lots, 15–18%, and choosing the higher 18% duty for his calculation of what the duties would be on reimportation of the export lot. He then multiplied the per-garment price of $5.07 times the number of garments (22,367) to get the total dollar value, and then multiplied it by the 18% customs duty. That calculation came to $20,412, which Stern rounded to $20,000 (TR 104).[2] Stern then added a "fairly generous approximation" for the costs of transporting the goods to and from Europe (TR 104), making a total cost on reimportation of $30,000.

Schenkers did not offer any evidence casting doubt on the correctness of Stern's calculation. Moreover, Schenkers belatedly claimed that MEI, in order to establish damages, had a burden of proof as to calculation of custom's duty. In the Joint Pre–

Trial Order, Schenkers had acknowledged MEI's claim that $30,000 was the mitigation amount, without setting forth any other calculation or specifically refuting MEI's calculation (id. ¶¶ 28–29). There was no mention of MEI's calculation of the mitigation amount in Schenkers' pre-trial memorandum. In both the pre-trial order and in Schenkers' pre-trial memorandum (at Point II) the only damages argument made by Schenkers was that MEI was not entitled to any damages because any damages were (allegedly) due to MEI's own negligence.[3] In its motion for a directed verdict Schenkers essentially questioned Stern's experience with respect to customs duties (TR 344). Schenkers only reference to MEI's mitigation claim in its Proposed Findings of Fact (Finding of Fact 56, p. 14) and post-trial memorandum (p. 24) was essentially to state that Stern had no prior experience regarding import/export and customs duties and to argue that therefore Stern's calculations should be rejected.[4]

Schenkers, of course, asserted its expertise in calculating customs duties, as demonstrated by the testimony of William Holmes. Yet, despite the fact that Schenkers knew the amount and method of MEI's calculation since in or about the end of June 1986 (as a result of the information contained in Stern's letter to Schenkers' president and chief executive officer; Exhibit 20; TR 105) Schenkers presented no calculation of its own as to what the customs duties would have been on reimportation of the export lot. The testimony of William Holmes as to factors to be considered and how one would calculate duties, without presenting any proof or calculation of an amount by which Schenkers claimed MEI's damages were mitigated, was inconsequential.

---

1. MEI's claim, including the $30,000 reduction and the manner in which it was calculated, was set forth in detail in Stern's June 27, 1986 letter to Schenkers' president and chief executive officer (Exhibit 20; TR 105).

2. Stern testified that there were "23,000–odd garments" (TR 104). There were actually 22,-367 garments (Exhibit 4) and Stern's mathematical calculation was based on the actual amount: $5.07 × 22,367 = $113,400.69 × .18 = $20,412.12.

3. Of course, the pre-trial order definitively framed the issues for trial. See Joint Pre–Trial Order, 10/4/91, at ¶¶ 1 and 2.

4. Defendant's post-trial memorandum of law (p. 24) inaccurately stated that "Plaintiff also claims that it calculated it would have been required to pay $30,000 in duties upon reimportation"—thus completely mischaracterizing Stern's actual calculation of separate duty and transportation cost amounts.

The fact that Stern's calculation was an approximation did not negate his method and reasoning. Whatever an exact calculation may have been, Schenkers waived and lost its opportunity to present contrary proof. Whether Stern had significant expertise was also irrelevant. Nor did it require a particular expertise to make the basic calculation which Stern made and was clearly capable of making based on his relevant business experience and his experience with the various FILA transactions in which he had been guided by Schenkers.

MEI had no burden of proving more than it did. The court was fully justified in accepting and crediting MEI's reasonable and essentially unrefuted proof.

■ MEI's burden was to demonstrate the *existence* of damages with reasonable certainty, not to prove the *scope* of such damages with exactitude. This burden has been met. A reasonable estimate of damages is all that is required. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–67, 66 S.Ct. 574, 579–80, 90 L.Ed. 652, 660–61 (1946); *Lexington Products v. B.D. Communications*, 677 F.2d 251, 253 (2d Cir. 1982). "[I]t is enough if the evidence show the extent of the damages as a matter of just and reasonable inference. . . ." *Story Parchment Co. v. Paterson Parchment Paper*, 282 U.S. 555, 562–63, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931).

### Statute of Limitations Defense Waived

■ On page 6 of its supporting memorandum Schenkers argues that plaintiff M.E. International (MEI) failed to establish that FILA (the Italian importer of the goods in question) would have been entitled to any drawback of the $80,000 it paid in duties on the goods in question. This argument is made notwithstanding the fact that the motion does not seek a vacation of the judgment on this ground. The motion to vacate is consequently denied for this reason.

■ The motion is also denied on statute of limitations grounds because of Schenkers' failure to include its claim in this regard in the Joint Pre–Trial Order (JPTO) which by its terms explicitly defined the issues to be tried. "The parties agree that the trial of this action should be based upon this order and upon the pleadings." JPTO paragraph 2. However, paragraph 1 of the order reads as follows: "The pleadings are deemed amended in accordance with the framing of the issues in this action in this pretrial order." The JPTO makes no mention of the statute now cited by Schenkers on page 6 of its memorandum (19 U.S.C. § 1313(j)(1)(A)(i)) and no mention is made in the JPTO of a statute of limitations defense. *Satchell v. Dilworth*, 745 F.2d 781 (2d Cir.1984). Statute of limitations is an affirmative defense which must be specially pleaded otherwise it is waived. Here Schenker did plead statute of limitations in general terms in its answer, but as noted above, the JPTO which supercedes this answer did not so plead.

Prior to trial Schenkers also moved for summary judgment in its favor on the ground that certain terms and conditions of two prior contracts between the parties here contained a statute of limitations and liability for damages clauses applicable to the oral contract at issue here. The motion for summary judgment was denied by this court on July 7, 1990 (SWK).

Schenkers made no request to find (in its proposed Finding of Fact submitted to the court) that MEI's claim to reimbursement of the $80,000 (less expenses) in duty paid by FILA is not recoverable due to the fact that FILA could not have recovered the duty paid because of the time bar statute on which it now relies.

Schenkers never pointed out to MEI in Schenkers memorandum of May 29, 1986 in which it gave all of its reasons for withdrawing from its representation of MEI with respect to the goods in question that MEI's main concern, i.e. recovery by FILA of the $80,000, was time barred (Exhibit 16).

Schenkers as FILA's representative had in its possession all the requisite information concerning when FILA shipped the goods in question and when they entered the United States, since Schenkers was also FILA's agent with respect to other goods of which the goods in question here were a part. Schenkers, therefore, had available

**990**

to it all of the facts necessary to properly plead and prove its affirmative defense but chose not to do so. There was reference to the issue on the trial (TR 140, 374–375, 428–429) but the issue of statute of limitations defense was not proved as required by Schenkers to be a bar to the $80,000. MEI was not prepared to meet the meager proof of this issue which Schenkers offered at trial.

As MEI has noted at page 15 of its memorandum of law in opposition to Schenkers' motion to vacate, Schenkers made a motion for a directed verdict at the end of plaintiff's case and did not move for judgment on the ground of statute of limitations at that time.

Schenkers raised the issue of statute of limitations after trial in its posttrial memorandum. The court concluded at that time by reference to the JPTO that the issue had not been designated as an issue for trial.

 F.R.Civ.P. 8(c) requires a party to assert statute of limitations as an affirmative defense, and states in relevant part: "Affirmative Defenses: In pleading to a preceding pleading, a party shall set forth affirmatively ... statute of limitations ... and any other matter constituting an avoidance or affirmative defense." Failure to raise the defense in a timely manner results in the defense being waived. Schenkers' failure to raise the issue of statute of limitations prior to their post-trial briefs constitutes a waiver of the defense. *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 955 (2d Cir.1988); *Strauss v. Douglas Aircraft*, 404 F.2d 1152 (2d Cir. 1968); *Fuller v. Alexander & Reed*, 760 F.Supp. 381, 385 (S.D.N.Y.1991).

The court, therefore, finds and concludes that the statute of limitations defense was not properly pleaded or proved on the trial and is therefore waived.

In denying the statute of limitations claim, this court also relies on all the reasons set forth by MEI in its memorandum in opposition to the motion to vacate.

The court finds no negligence on the part of MEI as claimed by Schenkers. Again Schenkers made no request to find negli-gence on MEI's part in its proposed findings of fact.